IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IMAX CORPORATION,                          :
                                           :     CIVIL ACTION NO. _____
                       Plaintiff,          :
                                           :
            v.                             :
                                           :
THE CAPITAL CENTER D/B/A                   :
CAPITAL CENTER FOR THE ARTS, SCIENCE       :
AND EDUCATION, INC.                        :
                                           :
                       Defendants.         :
                                           :

## COMPLAINT

Plaintiff IMAX Corporation ("IMAX") by its undersigned counsel, for its Complaint

against The Capital Center d/b/a Capital Center for the Arts, Science and Education, Inc.

("Capital Center"), alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction over this action under 28 U.S.C. § 1332 as

there is complete diversity of citizenship between Plaintiff and Defendant, and the amount in

controversy exceeds the sum of $75,000, exclusive of interest and costs.

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a

substantial part of the events or omissions giving rise to the claims stated in this Complaint

occurred in this district.

## PARTIES

3.      IMAX Corporation is a Canadian corporation with its principal place business in

Mississauga, Ontario.

4.      Upon information and belief, Capital Center is a Pennsylvania non-profit corporation with its principal place of business in Harrisburg, Pennsylvania.

## BACKGROUND

5.      IMAX is one of the world's leading entertainment technology companies, specializing in motion picture technologies and presentations.  IMAX offers a unique end-to-end cinematic solution combining proprietary software, theater architecture and equipment.

6.      IMAX and Capital City entered into an Agreement for IMAX® 3D Projection System and Trademark on or about June 18, 1996 (the "Original System Lease Agreement," attached as Exhibit A and incorporated by reference herein).

7.      The Original System Lease Agreement was subsequently amended by Amending Agreement Nos. 1 and 2 dated March 19, 1998 and August 31, 1999, respectively; the Service Partnership Program Agreement dated December 21, 2001; and the Renewal and Amending Agreement dated March 1, 2004 (attached as Exhibits B, C, D and E, respectively, and incorporated by reference herein).

8.      The Original System Lease Agreement and the 1998, 1999, 2001 and 2004 amendments collectively comprise the Lease Agreement.

9.      The 2004 amendment extended the Initial Term[1] of the Lease Agreement to September 8, 2019.

10.      Under the terms of the Lease Agreement, Capital City leased from IMAX one IMAX System for the Whitaker Center for Science and the Arts IMAX 3D Theatre located in Harrisburg, Pennsylvania.

---

[1] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Lease Agreement.

11.     Under the terms of the Lease Agreement, Capital Center agreed to pay IMAX an annual Maintenance Fee of $41,400 in one installment within fourteen (14) days of April 23 each year during the term of the Lease Agreement.  (Exhibit D, ¶ 5 and Schedule C thereto).

12.     Under the terms of the Lease Agreement, Capital Center agreed to pay Additional Rent to IMAX on a monthly basis and within 14 days after the end of the month in which such Additional Rent has been accrued.  (Exhibit A, Schedule A at 3; Exhibit E, ¶ C).

13.     The Additional Rent to be paid to IMAX each month was the greater of a Percentage Rate of the preceding month's admissions or a Minimum Rent of $75,000.  (Exhibit A, Schedule A at 3; Exhibit E, ¶ C).

14.     Capital City further agreed that in the event that it defaulted in any payment of any installment of any sum payable under the Lease Agreement, and failed to begin to cure such default within thirty (30) days written notice from IMAX:

> IMAX may, at· its election, terminate this [Lease] Agreement, with or without entry., and all of the rights of [Capital City] with respect to the System and the use thereof shall be absolutely forfeited and shall lapse and [Capital City] shall pay to IMAX its losses and damages. All unpaid amounts due to IMAX shall be forthwith paid by [Capital City].  IMAX shall be entitled to retain all payments made by [Capital City] during the Term and the Minimum Rent for the unexpired portion of the Term shall be accelerated based on a discount rate equal to the then current prime rate announced by IMAX's principal lender, and shall become due and be paid upon the demand of IMAX. Such amounts shall be paid and/or retained by IMAX, as the case may be, as liquidated damages and not as penalty.

(Exhibit A, Schedule B, ¶ 11(a)).

15.     The Lease Agreement also requires Capital City to fully cooperate in permitting IMAX access to the theatre at the Whitaker Center for Science and the Arts to regain possession of the System upon the termination of the Agreement.  (Exhibit A, Schedule B, ¶ 12).

16.     With respect to removal and return of the System upon the termination of the agreement, the Lease Agreement provides:

3

Unless the termination of this Agreement is the result of a breach of IMAX, all costs of removal and return shipment of the System, excluding any cables, the recovery of which is not economical or practical, but including export packaging, shall be at the expense of [Capital City].   Upon any termination of this Agreement, IMAX shall, at its expense, supervise the removal of the System from the Theatre. [Capital City] shall. cause the Projection System and Glasses Cleaning Machine to be returned, properly packaged as required by IMAX, to IMAX at Mississauga, Ontario, Canada and the Sound System to Sonics Associates at Birmingham, Alabama, or such other location as IMAX may reasonably designate, provided the cost of shipping the System to another location shall be no greater than the cost of shipping the System as aforesaid. Except as otherwise provided, and subject to IMAX carrying out its agreements with respect to service and maintenance, the System shall be returned in good condition and repair, otherwise IMAX may make all repairs and replacements necessary to place the System in good condition and repair, reasonable wear and tear excepted, and [Capital City] shall pay the cost of such repairs and replacements upon demand, unless previously paid out of insurance proceeds.

(Exhibit A, Schedule B, ¶ 12).

17.     Capital City has failed to pay IMAX the annual Maintenance Fee in a timely manner, as stopped paying the annual Maintenance Fee as of September 21, 2014.

18.     Capital City has failed to pay the Additional Rent due to IMAX in a timely manner, as it stopped paying the Additional Rent as of July 31, 2014.

19.     By letter dated September 4, 2014, IMAX provided Capital City notice  that pursuant to the Lease Agreement, Capital Center had defaulted on its obligations to IMAX with respect to payment of the Additional Rent and Maintenance Fee (the "Notice of Default," attached as Exhibit F and incorporated by reference herein).

20.     In the Notice of Default, IMAX demanded that Capital Center fully cure such default within thirty (30) days of the date of the Notice of Default and stated that any failure by Capital Center to fully remedy and cure its default would permit IMAX to terminate the Lease Agreement and claim all amounts owed to IMAX, including all unpaid Minimum Rent obligations for the Initial Term of the Lease Agreement.

4

21.     By letter dated October 30, 2014, IMAX terminated the Lease Agreement as a result of Capital City's failure to take steps to cure the defaults outlined in the Notice of Default (the "Notice of Termination," attached as Exhibit G and incorporated by reference herein).

22.     Capital City has not paid the outstanding amounts due to IMAX under the Lease Agreement.

## COUNT I – BREACH OF CONTRACT

23.     Plaintiff realleges and incorporates by reference the averments set forth in each of the preceding paragraphs as if fully set forth herein.

24.     Pursuant to the Least Agreement, IMAX provided Capital City an IMAX System and related maintenance services.

25.     IMAX performed its obligations under the Lease Agreement.

26.     In consideration for the goods and services provided to Capital City under the Lease Agreement, Capital City agreed to make certain payments to IMAX, including but not limited to Additional Rent and Maintenance Fees.

27.     Capital City breached this obligation by failing to make Additional Rent and Maintenance Fee payments in a timely manner.

28.     On September 4, 2014, IMAX provided Capital City the Notice of Default, which notified Capital City that it had defaulted on its obligations to IMAX with respect to payment of the Additional Rent and Maintenance Fee.

29.     Pursuant to Lease Agreement, Capital City had thirty (30) days to take steps to cure the defaults outlined in the Notice of Default.

30.     Capital City did not take steps to cure the defaults before the expiration of the cure period.

31.     On October 30, 2014, IMAX terminated the Lease Agreement as a result of Capital City's failure to take steps to cure the defaults outlined in the Notice of Default.

32.     IMAX has suffered damages as a result of Capital City's breaches of the Lease Agreement.

33.     As a result of Capital City's breaches and IMAX's subsequent termination of the Lease Agreement, IMAX is entitled to damages for Capital City's breaches equal to the amounts owed to IMAX, including all unpaid Minimum Rent obligations for the Initial Term of the Lease Agreement.

### PRAYER FOR RELIEF

WHEREFORE, IMAX respectfully requests that this Court grant the following relief:

(a)     Order Capital City to pay damages equal to all amounts owed to IMAX, including all unpaid Minimum Rent obligations for the period up to and including September 2019, as outlined in Exhibit A, Schedule B, ¶ 11(a);

(b)     Grant any and all such additional and further relief as this Court may deem just and equitable.

Respectfully submitted,

**DUANE MORRIS LLP**

BY:     /s/Lawrence H. Pockers
        Lawrence H. Pockers (PA I.D. No. 84589)
        Daniel R. Walworth (PA I.D. No. 204968)
        (*pro hac vice* application to be filed)
        30 South 17th Street
        Philadelphia, PA  19103
        Phone:  215-979-1153/1194
        Fax:  215-979-1020
        Email:  lhpockers@duanemorris.com
                dwalworth@duanemorris.com

February 20, 2015                    *Counsel for Plaintiff IMAX Corporation*

# EXHIBIT A

38 Isabella Street
Toronto, Ontario, Canada, M4Y 1N1
Telephone: (416) 960-8509  Telefax: (416) 960-8596

## AGREEMENT FOR IMAX® 3D PROJECTION SYSTEM AND TRADEMARK

> .tal Center for the Arts, Science and Education, Inc., a non-profit corporation under the laws of Pennsylvania ("Client").
:LIENT NAME

). Thomas R. Stone, President and CEO
.TTENTION

221 ~ 8201           221 ~ 8208
. ~outh Second St., 5th Floor, Harrisburg, Pennsylvania     717-231-8290-      717-231-8296
TREET ADDRESS        TELEPHONE      TELEFAX

.he Whitaker Center for Science and the Arts IMAX® 3D Theatre, Harrisburg, Pennsylvania ("Theatre")
ROPOSED NAME AND LOCATION OF THEATRE

.1X® 3D Projection System (the "Projection System"),  1 Digital Sound System (the "Sound System"), 1 Screen (the "Screen")
.nd 1 Glasses Cleaning Machine (the "Glasses Cleaning Machine") all as more particularly defined in Schedule C - Specifications
.f System and Installation, Testing and Training Services (collectively the "System").
. EM

.t contracts for and Imax Corporation ("Imax") agrees to furnish the products and services upon the terms listed in the following
. dules, each of which is part of this Agreement.

| | | |
|---|---|---|
| Schedule A | - | Delivery,  Payment  and Maintenance Provisions |
| edule B | - | General Terms and Conditions |
| Schedule C | - | Specifications of System and Installation, Testing and Training Services |
| Schedule D | - | Electrical, Mechanical and Acoustical Requirements to be Provided by Client |
| Schedule E | - | Specifications for sourcing IMAX® 3D Electronic Viewing Glasses |
| Schedule F | - | Box Office Report |
| Schedule G | - | Exclusive Rights |

*lient has read this Agreement and each Schedule and understands that the General Terms and Conditions of Schedule B
*ncluding Article 10 (c) - Disclaimer of Warranty and Limitation of Remedies) apply fully to all Schedules made a part of this
*ement and acknowledges that it understands and is bound by this Agreement.*

.GREED TO BY:                    ACCEPTED this 18 day of June , 1996 BY:

.ITAL CENTER FOR THE ARTS,                IMAX CORPORATION
.CIENCE AND EDUCATION, INC.

.uthorized Signature(s)              By (Authorized Signature(s)
THOMAS  R. STONE, PhD                    G. Mary Ruby          John M. Davison
(s) (Type or Print)                   Names Vice President       Senior Vice President
PRESIDENT AND CEO                     Legal Affairs        Chief Financial Officer
*le(s) (Type or Print)                Title(s) (Type or Print)

.s address for notice required by the terms of this Agreement is as provided above and should be addressed to the LEGAL AND BUSINESS AFFAIRS
.MENT.  Client's address for notice required by the terms of this Agreement, including notice of change in address if different than above is:
City of Harrisburg - Concurrence

.ss                          Telephone

*ention                       Telefax
Stephen R. Reed
Mayor, City of Harrisburg

# SCHEDULE A
## DELIVERY, PAYMENT AND MAINTENANCE PROVISIONS

### The Whitaker Center for Science and the Arts IMAX® 3D Theatre

---

**PART I**                    **DELIVERY AND TERM OF AGREEMENT**

---

### DELIVERY DATE

December 31, 1998, or such date as is mutually agreed to by the parties (the "Delivery Date").

### ADDITIONAL DELIVERY NOTES

Imax will deliver to the Client the Projection System and Glasses Cleaning Machine F.O.B. the delivery dock at Imax's premises in Mississauga, Ontario, Canada; the Sound System F.O.B. the delivery dock of Sonics Associates in Birmingham, Alabama and the Screen F.O.B. the delivery dock of Harkness Screens in Boreham Wood, England. Imax shall prepare the System for and select the means of transit, as appropriate, and thereafter Imax agrees to act as Client's agent in arranging for such shipping, including arranging for appropriate insurance coverage, provided that Imax shall be reimbursed by Client forthwith for all costs of such transportation, including the cost of insurance.

### TERM OF AGREEMENT

The initial term of this Agreement shall commence on the date hereof and end on the 10th anniversary of the Date of Acceptance, as defined in Paragraph 3 (d) of Schedule B - General Terms and Conditions (the "Initial Term").

### RENEWAL TERM

The Initial Term will be automatically renewed for 1 further 10-year term (the "Renewal Term") ending on the 20th anniversary of the Date of Acceptance, on the same terms and conditions, except for payment of the Initial Rent which will not be required, if Client is not in default of any of its obligations under this Agreement and the Sound System has either been refurbished, or in lieu of so refurbishing a new maintenance agreement has been concluded with Imax for the Renewal Term. Imax will advise Client of the cost of refurbishing the Sound System at least 9 months prior to the end of the 10th anniversary of the Date of Acceptance. Where applicable, the Initial Term and Renewal Term are collectively referred to as the "Term". Client may elect not to continue this Agreement for the Renewal Term. Client must notify Imax, in writing, of its intention not to renew this Agreement no later than 6 months prior to the expiry of the Initial Term.

Initialled by _____ for Client

Initialled by _____ for Imax

## PART II          RENT

### INITIAL RENT

Client shall pay  $1,905,000 U.S.  as initial rent for the use of the System (the "Initial Rent), payable in the City of Toronto, Ontario, Canada, as follows:

| | PAYMENTS | DATE  PAYABLE |
|---|---|---|
| (i) | $ 100,000 U.S. | has already been received by Imax |
| (ii) | $ 100,000 U.S | upon the execution of this Agreement; |
| (iii) | $ 371,500 U.S. | upon the date that is 24 months prior to the Delivery Date; |
| (iv) | $ 571,500 U.S. | upon the date that is 18 months prior to the Delivery Date; |
| (v) | $ 571,500 U.S. | upon the date that is 12 months prior to the Delivery Date; and |
| (vi) | $ 190,500 U.S. | upon the Date of Acceptance, provided that if the Date of Acceptance is delayed beyond April 30, 1999 due to the actions or inactions of Client, then such payment shall be due not later than April 30, 1999. |

/ments (v) and (vi) above, are to be paid by draw down on irrevocable Confirmed Letters of Credit in a form and drawn un a bank acceptable to Imax, to be issued by Client as follows:

(a)      in respect of payment (v) at such time as payment (iv) is due and payable; and

(b)      in respect of payment (vi) on the date that is 3 months prior to the Delivery Date;

which Letters of Credit shall expire no earlier than 30 days following the date the respective installment of Initial Rent is payable thereby.  The Letters of Credit shall provide for payment to Imax on the above-noted dates upon presentation of a standard commercial invoice by Imax for the above-noted amounts, together with a certification that Imax is not then in default of any obligation under this Agreement.

Initialled by _____ *TRS* for Client

Initialled by _____ for Imax

Schedule A (Cont'd.)

## ADDITIONAL RENT

Client shall pay to Imax, in arrears on a monthly basis, rent throughout the Term.  The monthly rent payable to Imax will be the greater of: (a) 7% of Net Theatre Admissions for the preceding month (the "Percentage Rent"), and (b) the Minimum Rent/Seat/Annum specified below, multiplied by the actual number of seats in the Theatre and divided by 12, less the amount by which the aggregate Rent paid during the year to date exceeds the Minimum Rent pro rated over the year to date.  The Percentage Rent and the Minimum Rent are collectively referred to as the "Additional Rent".  The Additional Rent shall accrue from the earlier of the opening of the Theatre to the public and April 30, 1999 (the "Commencement Date"), provided that if the delivery of the System is delayed beyond the Delivery Date or the opening of the Theatre is delayed subsequent to the Delivery Date, in either case due to the fault of Imax, the Additional Rent will accrue from the earlier of the opening of the Theatre to the public, and 120 days after the default has been cured by Imax and further provided that if the Theatre is not ready for installation due to construction delays or if Client loses a material amount of funding currently allocated to the Theatre project, then the Additional Rent shall accrue from the date on which new funding in an amount equal to such lost funding is raised by Client, or on which the Theatre is ready for installation, as the case may be, which date shall in no event be later than October 30, 1999.  For the purposes of this section, a "material amount of funding" means any amount greater than $2.5 million dollars.  The Additional Rent shall be paid monthly to Imax during each year of the Term within 14 days after the end of the month in respect of which such Additional Rent has been accrued.  Any late or overdue payments shall accrue interest as provided in Paragraph 14(j) of Schedule B.

| EST. NO. OF SEATS | MINIMUM RENT/SEAT/ANNUM | MINIMUM RENT/ANNUM | INDEX BASE DATE |
|---|---|---|---|
| 200 | U.S.  $ 355 | U.S.  $ 71,000 | December 31, 1995 |

e term "Net Theatre Admissions" shall mean all amounts, or other consideration, received by Client for admission to the ...heatre after deducting amusement or entertainment taxes, admissions or gross receipts taxes, sales taxes or other similar impositions levied on the admissions price by and actually paid by Client to local, state or federal authorities.  Client may provide up to 1% of total Theatre admissions in any year of the Term free of charge to promote the Theatre.  Any free admissions exceeding 1% of total admissions shall be deemed to be fully paid admissions for the calculation of Net Theatre Admissions.  If Client offers its patrons combination ticket pricing options for admission to various attractions, including the Theatre, the amount attributable to Net Theatre Admissions will be the pro rated portion of the combination ticket representing admission to the Theatre, based on the regular prices for admission to the individual attractions which are included in the combination ticket as a percentage of the combination ticket price.

The Minimum Rent shall, on each anniversary of the Commencement Date, be adjusted to take into account any increase or decrease in the Consumer Price Index applicable to the Metropolitan area in which the Theatre is situated (the "Index"), from the Index Base Date indicated above to the end of the month prior to the Commencement Date or the anniversary thereof.  In the event the Index is not available on such anniversary date monthly installments thereafter shall be based on the amount payable for the previous month and shall be adjusted retroactively when the Index is published.

The number of seats shall be 200 for the purpose of determining the Minimum Rent, if for any reason the construction of the Theatre has not been completed.  Client shall then advise Imax of the actual number of seats in the Theatre prior to the opening of the Theatre and or immediately upon any further change.  The actual number of seats will then be used to calculate the Minimum Rent.

Initialled by _TNS_ for Client

Initialled by _____ for Imax

## PART III             MAINTENANCE

### MAINTENANCE AND WARRANTY

(a)     Service, maintenance and replacement parts for the System, excluding, Xenon lamps and particle transfer rollers for the Projection System, reproducer heads for the Sound System, fluids for the Glasses Cleaning Machine, shall be provided free of charge by Imax for a period of 1 year from the Date of Acceptance. For the remainder of the Initial Term, such service, maintenance and replacement parts excluding the Screen, shall be provided by Imax for the annual consideration specified below.

(b)     Subject to Client making all payments required under this Agreement, Imax shall provide good and workmanlike service and preventive maintenance for the System, excluding the Screen, so that under normal circumstances the System, excluding the Screen, will operate reliably and to the specifications described in Schedule C. Replacement parts for the System, excluding those items set out above, shall be provided by Imax at no additional cost to Client during the Initial Term. If Client intends to renew this Agreement beyond the Initial Term then certain components which are subject to normal wear and tear must be refurbished at the expense of Client. Imax will advise Client of the necessary refurbishment at least nine (9) months prior to the end of the 10th anniversary of the Date of Acceptance.

(c)     Imax shall render quarter-yearly preventive maintenance, cleaning and inspection of the System, excluding the Screen, and Imax, its agents or representatives, shall make any emergency visits as required to perform its maintenance obligations under this Agreement. Imax will respond to Client's request for the provision of emergency service, as appropriate, within 48 hours of receipt of notice from Client.

(d)     Imax warrants that if Client adheres to the maintenance program provided by Imax in this Agreement and exclusively employs Imax trained and certified projectionists to operate the System, in any 12 month operating period throughout the Term the System will be operable for not less than 98% of the normal operating schedule of the Theatre. This warranty excludes the Screen and downtime which results from power outages or other factors beyond the control of Imax, including misuse, misoperation, willful neglect, deliberate damage or negligence by anyone other than Imax's employees or representatives.

(e)     Imax shall make at Client's request and at Client's expense any improvements and modifications developed by Imax to the Projection System on as favourable a basis as they are available to other similar customers of Imax.

(f)     Any damage to the System resulting from the misuse or misoperation of the System, work performed on the System by third parties, carelessness, willful neglect or deliberate damage or negligence by anyone other than Imax's employees or representatives shall be repaired promptly by Imax at the expense of Client. No such damage to the System shall be repaired by anyone other than Imax without Imax's consent in writing unless Imax refuses or unreasonably fails to service and/or repair the System.

Initialled by _TM_ ___ for Client

Initialled by _____ for Imax

Schedule A (Cont'd.)

## MAINTENANCE FEE

Upon expiration of the 1 year warranty period described above, Client shall pay an annual maintenance fee to Imax in respect of the maintenance services, as follows:

| ANNUAL MAINTENANCE FEE | INSTALLMENTS PAYMENTS | FIRST PAYMENT DATE | INDEX BASE DATE |
|---|---|---|---|
| U.S. $83,500 | Equal quarterly payments in advance | 1st anniversary of the Date of Acceptance | Same as Minimum Rent in Part II |

The annual maintenance fee shall, on each anniversary of the Commencement Date, be adjusted to take into account any increase or decrease in the Index, from the date indicated in Part II above to the end of the month prior to the Commencement Date or the anniversary of the Commencement Date. In the event the Index is not available on such anniversary date, such quarterly installments due thereafter shall be based on the amount payable for the previous quarter and shall be adjusted retroactively when the Index is published.

---

PART IV                 EARLY TERMINATION

(a)     Notwithstanding any other provision in this Agreement including Section 11 of Schedule B, Client may terminate this Agreement at any time prior to the Delivery Date, if and only if Client loses all of the funding presently allocated to it by either of the State of Pennsylvania (the "State") or The Whitaker Foundation ("TWF"). For the purposes of this Part IV, funding from the State is the sum of $18 million dollars and funding from TWF is the sum of $7 million dollars.

(b)     If at any time prior to the Delivery Date Client wishes to terminate this Agreement in accordance with paragraph (a) above, then the full amount of the Initial Rent still unpaid and outstanding at the time of such termination will become immediately due and payable to Imax, and Imax shall be entitled to retain the entire amount of the Initial Rent as liquidated damages. All such amounts owing to Imax shall be paid at such time as a written termination notice is delivered to Imax.

(c)     In the event that this Agreement is terminated in accordance with this Part IV, Client shall not, during the period of twenty four (24) months following the date of the termination of this Agreement, either individually or in partnership or in conjunction with any person or persons, firm, association, syndicate, company or corporation whatsoever, directly or indirectly, carry on or be engaged in or be concerned with or interested in or advise, lend money to, guarantee the debts or obligations of or permit its name or any part thereof to be used or employed by any person or persons, firm, association, syndicate, company or corporation engaged in or concerned with or interested in the development, construction, operation, financing or promotion of large format motion picture theatres utilizing projection prints in excess of 35 mm (standard academy aperture). This provision shall not restrict Client from any film production activity in any film format, unrelated to the development, outfitting, design, and financing of a large format (in excess of 35 mm standard academy aperture) motion picture theatre.

Initialled by _TM_ for Client                                        Initialled by _____ for Imax

# SCHEDULE B
## GENERAL TERMS AND CONDITIONS
### The Whitaker Center for Science and the Arts IMAX® 3D Theatre

### 1. LEASE OF SYSTEM

Subject to the terms and conditions of this Agreement, including payment of the Initial Rent and the Additional Rent as provided in Schedule A, Imax agrees to lease to Client the System described in Schedule C.

### 2. PAYMENTS

(a) Client shall keep complete and accurate attendance records of all persons entering the Theatre and other records required to calculate the Additional Rent payable pursuant to Part II of Schedule A. Admission to the Theatre shall be by consecutively numbered tickets showing the price of admission and all applicable taxes. Client shall deliver to Imax, together with the Percentage Rent or Minimum Rent for each month, a certified schedule substantially in the form attached as Schedule F, indicating admissions to the Theatre for each film exhibited during the month, all admission prices and ticketing combinations, and the number of admissions at each admission price for each film, signed by its authorized representatives certifying the calculation of Net Theatre Admissions for the preceding month. On reasonable notice, Client shall permit Imax's accountant full access during normal business hours to such records, and Imax's authorized representatives shall have the right at any time to check the operation of any devices used to ascertain the number of admissions to the Theatre.

(b) Client shall pay any taxes, duty, customs and similar charges levied on or respecting the System, the license to use the Trademark or payments to be made to Imax hereunder by any government or authority, (excepting only Imax's income tax) whether the same be assessed to Client or to Imax, provided that if under local law Client may not make such payments, it shall reimburse Imax on demand for all such payments made by Imax. Prior to the Delivery Date, and together with Client's monthly certification of Net Theatre Admissions, Client will provide Imax with certification of compliance with all local, state or federal sales, franchise or other taxes payable in respect of all payments made pursuant to this Agreement. If Client is exempt from the payment of such taxes, Client's certification of compliance will state the basis for such exemption, and where applicable will include Client's tax exempt number.

(c) The Initial Rent, the Additional Rent and other amounts required to be paid by Client shall be paid without any deduction, abatement or setoff except for withholding or similar income taxes required by law to be deducted at source and except as allowed by Section 10(a) below. Any such deduction, abatement or setoff by Client shall be deemed to be a default as provided in Paragraph 11(a) hereof.

### 3. DELIVERY, INSTALLATION, TRAINING AND STORAGE

(a) Imax shall deliver the System on the Delivery Date and on the terms provided in Schedule A. Within 15 days of the Delivery Date, Client will deliver the Projection System, Sound System and Glasses Cleaning Machine to the projection room in the Theatre. Client will deliver the Screen to the Theatre as quickly as possible using the means of transportation selected by Imax, provided the means of transportation are safe and reasonably economical. All costs of handling, and transportation from the delivery docks at the location(s) specified in Schedule A to the Theatre and all charges for insurance while the System is in transit to the Theatre shall be the responsibility of Client.

(b) Imax shall, at its expense, supervise the installation of the System in the Theatre, such installation to be completed 6 weeks after the Theatre is fully complete and ready for the installation. Client shall, at its expense, be required to supply materials and personnel for the proper installation of the System. All installation costs, excluding Imax's supervision, shall be paid by Client. Client, at its cost, shall provide a fully complete Theatre ready for the installation of the System with all required services for the System as specified in Schedule D prior to Imax being required to commence the supervision of the installation of the System.

(c) The run-in testing of the System in the Theatre and the training of Client personnel as operators of the System, as provided in Schedule C, shall be completed by Imax within 3 weeks of the completion of the installation of the System.

(d) The date on which Imax certifies to Client, and Client is in agreement that the installation, run-in testing and training is complete shall be referred to as the "Date of Acceptance".

(e) Storage of the System at any time during the Term after the Delivery Date shall be arranged at the request of Client and with the prior consent and assistance (when reasonable and practical) of Imax and shall be in a secure, temperature and humidity-controlled environment, provided that Client agrees to pay all such storage costs

Initialled by _TNS_ for Client

Initialled by _____ for Imax

m and after December 31, 1998, regardless of any change to the Delivery Date requested by Client and agreed to by Imax. Client shall pay all transportation and insurance costs required to transport the equipment to the storage facility, store the System and transport the System from the storage facility to the Theatre.

### 4. COVENANTS OF IMAX

(a) On the Date of Acceptance and throughout the remainder of the Term, the System shall conform to the specifications set out in Schedule C, provided that the System is properly operated and maintained, and shall incorporate all necessary technical improvements developed to the date of this Agreement and relevant to this installation.

(b) The System and this Agreement shall be free from all liens, claims, charges and encumbrances during the Term, except such liens, claims, charges and encumbrances which Imax may provide to its lenders from time to time and, which shall be subordinate to Client's continuing use of the System, pursuant to the terms of this Agreement.

Imax, at no additional cost to Client, will reasonably advise and consult with Client with respect to the optimal cinematic and acoustic design and construction of the Theatre.

(d) Subject to Paragraph 10(c) hereof, Imax represents and warrants to Client that the use of the System and the Trademark by Client do not and will not infringe, conflict with, or violate any right of any person, firm or corporation. Imax will indemnify, defend and hold harmless Client and each of its officers, directors, employees and affiliates, from and against any and all actions, claims, suits, liabilities, judgments and obligations, and all direct costs and expenses incurred, including reasonable attorney fees and costs, directly arising out of any claim that any of the Trademark or any use of the System, or patents incorporated therein infringes on, conflicts with or violates any right of any person, firm or corporation.

(e) Imax has and will maintain throughout the Term, a maintenance system capable of providing the continued maintenance of the System specified herein.

### 5. COVENANTS OF CLIENT

(a) Client shall not disclose any information, data, plans or specifications of a confidential nature concerning the System, during the Term or at any time thereafter,

including, without limiting the generality of the foregoing, any designs, drawings, technical specifications or other such information, service manuals, commercial data or quotations, including without limiting the foregoing, this Agreement, to any person, firm or corporation or aid, assist or permit any person, firm or corporation in obtaining knowledge of the working mechanism of any part of the System other than such as may be necessary for the competent operators trained or approved by Imax to operate the System, or as may be required by law.

(b) Client shall not copy or reproduce in any way or manner the System or any part or component thereof.

(c) Client shall possess, use and operate the System in accordance with all applicable laws, ordinances and regulations.

(d) Imax shall be provided with reasonable access to the Theatre, and the records of Client pertaining to the operation of the Theatre, in order to verify compliance with the provisions of this Agreement and to service and inspect the System.

(e) Client shall allow Imax to affix and place on the System such additional plates or engravings as it considers necessary to give notice of its rights under this Agreement and applicable laws, and Client shall not remove such plates, engravings or identifications.

(f) Client shall not attempt to move the System from the projection room in the Theatre without the prior written consent of Imax.

(g) Commencing from the Delivery Date, Client shall indemnify and hold harmless Imax from and against any and all liabilities, claims and judgments for damage arising out of, or for injury to or death of persons, or damage to property occasioned by the operation, maintenance (other than by Imax) or use of the System by Client and shall obtain appropriate property and liability insurance in this regard naming Imax as a co-insured in form and with limits as specified in Paragraph 8, with a loss payable provision in favour of Imax, except to the extent that such liabilities, claims or judgments for damage are caused by the negligence of Imax.

(h) All design and construction details that may affect the quality of the theatrical presentation by the System, including, without limiting the generality of the foregoing, interior decoration and lighting of the Theatre, design of the screen, theatre geometry and the audience-to-screen relationship, ambient lighting reaching the screen during the show, as well as proper design and construction of

Initialled by _____ TMS _____ for Client

Initialled by _____ _____ for Imax

projection room and ancillary spaces shall be subject to the prior written approval of Imax. The noise control and acoustics of the Theatre shall conform to the specifications set out in Schedule C hereto.

(i) Should Client elect to acquire the necessary IMAX® 3D polarized viewing glasses ("Glasses") from a third party supplier, such Glasses shall conform to the specifications set out in Schedule E hereto. However, the design of the Glasses shall be submitted to Imax for review and approval no later than 4 months prior to the opening date of the Theatre, in order to allow sufficient time for any supplier other than Imax to perform any modifications, if necessary, before manufacturing in quantity.

(j) During the Term and following the termination of this Agreement, Client shall not give any assistance by way of information, financial aid or technical support or in any other manner whatsoever to parties other than Imax, its successors and assigns which might adversely affect the validity or enforceability of either of the Trademark or any other trademark, patent, trade secret or confidential information of Imax unless compelled by due process of law and upon prior written notice to Imax.

(κ) Client shall keep the System free and clear of any and all liens, claims, charges and encumbrances arising by, through or under Client during the Term.

## 6. TRADEMARK LICENSE

(a) Commencing on the date of this Agreement, and until the termination of this Agreement, Imax grants to Client a non-exclusive, non-transferable license to use the trademark "IMAX®" (the "Trademark") in association with the services of operating an IMAX® 3D motion picture theatre. Subject to Imax's final approval, Client shall use the Trademark in the Theatre name, and use or display the Trademark in the performance or advertising of services performed in connection with the Theatre. Client shall use the Trademark only in a manner and proper logo form as may be directed from time to time by Imax including proper reference to Imax Corporation as registered owner of the Trademark, and will not make any additions to or deletions from the Trademark except as directed by Imax. The services offered by Client shall conform to such reasonable standards as may be set by Imax from time to time in so far as such standards relate to the goodwill and continued enhancement of the Trademark. Client shall not use any trademarks, derivations or words which are confusingly similar to the Trademark, or which may detract from the distinctiveness of the Trademark and their purpose of distinguishing the

products and services of Imax.

(b) Client agrees to use the Trademark in a conspicuous manner in all promotions and advertising for the Theatre or for any film exhibited using the System, unless Imax notifies Client not to use the Trademark, in association with a specific film. At the request of Imax, Client will provide Imax with copies of all advertisements, promotional materials and any other materials in which the Trademark has been or will be used and will cause any objections of Imax relating to the use of the Trademark to be resolved immediately upon receipt of notice from Imax, including without limitation any usage which in the opinion of Imax might tend to lessen the significance of the Trademark as branding and identifying products and services having their origin with Imax.

(c) Client shall not use the System to exhibit films where greater than 50% of the footage incorporated in the film has been principally photographed in any film format smaller than 65 mm, 15 perforation per frame advance. Films presented at the Theatre using other projection equipment, in formats other than the IMAX® format, shall be preceded by a statement clearly indicating that the film being presented is not an IMAX® format film and promotional material for any such presentation shall also contain such a statement.

(d) Client will report to Imax any infringement or imitation of, or challenge to the Trademark of which Client becomes aware. In the event that Imax commences any action or legal proceeding on account of such infringements, imitations or challenges, Client agrees to provide all reasonable assistance (other than financial assistance) requested by Imax in prosecuting same. Imax will make all reasonable efforts to enforce the Trademark when notified of any infringement or imitation of or challenge to the Trademark that, in the sole discretion of Imax, are substantial and will lead to the loss of goodwill associated with the Trademark.

## 7. RIGHTS OF IMAX TO THE SYSTEM

(a) During the Term and until the delivery of the System to Imax thereafter, Client shall maintain the System as moveable, personal or chattel property. If under local laws the System is considered to be a fixture, Client agrees that the System shall remain subject to the rights of Imax. Any sale, conveyance, lease, mortgage, transfer, assignment or other disposition or alienation of Client's interest in the property in or on which the Theatre is situated, shall be made subject to the rights of Imax respecting the System.

Initialled by _TW_ for Client

Initialled by _____ for Imax

Client will procure from any person acquiring an interest in the property upon which the System may be attached, an acknowledgment of Imax's rights under this Agreement, in writing, and in form and content satisfactory to Imax.   Client shall consent to the registration of this Agreement and/or notice of the same to the extent permitted by law to provide notice to third parties that Imax retains title and ownership of the System.

8.   **INSURANCE**

Commencing on the Delivery Date of the System to Client, until the delivery of the System to Imax following the termination of this Agreement, Client shall obtain all risk property insurance and comprehensive general liability insurance, with the following minimum coverage:

**All Risk Property Insurance,** naming Imax as the loss payee in an amount equal to the Initial Rent, depreciated on a straight basis over 20 years subject to any limitation imposed by an insurance company acting reasonably which may restrict coverage to an amount not in excess of the value of the equipment.  Any deductible portion shall not exceed 5% of the insured amount, in the aregate.

**Comprehensive General Liability Insurance,** naming Imax as an additional insured with regard to the operation of the System, in an amount not less than $5,000,000 (U.S.) combined single limit.

Each liability policy will be primary without right of contribution from other insurance which may be carried by Imax and will expressly provide that all of the provisions thereof, except the limits of liability, will operate in the same manner as if there were a separate policy covering each insured.  Each policy of insurance will provide that once any payment by or on behalf of any insured has been made to Imax in accordance with these requirements, the insurers and any subrogees will have no right of recourse against Imax.  Each policy will require at least 30 days written notice be given to Imax before any termination, expiry, surrender, cancellation or material change.   The insurer will be required to promptly notify Imax if any installment of premium is not paid on time by Client.  A certificate of such coverage will be provided to Imax no later than the Delivery Date.

9.   **DAMAGE OR LOSS TO THE SYSTEM**

.) In the event of damage to or loss of the System from any cause after the Delivery Date, Imax shall, unless otherwise agreed pursuant to Paragraph 9 (b), with best

efforts and due diligence, repair the System or construct another System at the expense of Client, provided that Imax shall first apply all insurance proceeds received by it to such repair.  Subject to the termination of this Agreement pursuant to Paragraph 9 (b), such damage to or loss of the System shall not terminate this Agreement or entitle Client to any abatement or reduction of Additional Rent or other charges payable. Coinciding with Client's obligations to begin paying Additional Rent hereunder, Client shall obtain, at its expense, business interruption insurance to provide these payments for not less than 18 months in the event of any such damage or loss.

(b) If all or part of the Theatre is rendered unusable by damage from fire or other casualty which cannot be substantially repaired (employing normal construction methods without overtime or other premium) under applicable laws and governmental regulations within 180 days from the date on which insurance proceeds relating to such casualty are received, then Imax or Client may elect to terminate this Agreement as of the date of such casualty by written notice delivered to the other not more than 30 days after determination of the extent of damage to the Theatre.  In the event that either party elects to terminate this Agreement in accordance with this paragraph 9(b), then Imax shall be paid all of the proceeds of insurance money, and Imax shall be entitled to take possession of the System for its salvage value, if any.   Client waives any statutory or other rights of termination by reason of fire or other casualty, it being the intention of the parties to provide specifically in this Paragraph 9 for all circumstances under which rights of termination shall exist due to casualty.

10.   **DEFAULT OF IMAX**

(a) Imax acknowledges that time is of the essence under this Agreement, therefore, whenever Imax is in default of its material obligations under this Agreement and continues to be in default, or fails to begin to cure such default, within 30 days after Client has delivered written notice of the default to Imax, Client may either: terminate this Agreement and require Imax to remove the System at its own expense in which case no Additional Rent or other charges shall be payable from and after the date of such termination; or Client may perform the continuing obligations of Imax with respect to which Imax has made default and may deduct the cost thereof from the Additional Rent payable, notwithstanding the provisions of Paragraph 2(c) hereof.

(b) The adjudication of Imax as bankrupt or insolvent or if it should be put into receivership or a trustee appointed

Initialled by _T/B_ for Client                                                    Initialled by _____ for Imax

the benefit of its creditors, shall not be deemed to be a material breach by Imax of the terms of this Agreement. If Imax is otherwise in default of its obligations Client may pursue either of the remedies provided in Paragraph 10 (a).

**(c) Disclaimer of Warranties and Limitation of Remedies.** The covenants, representations and warranties of Imax contained in this Agreement are in lieu of all other covenants, representations and warranties, expressed, statutory or otherwise implied, as to the System, its condition, fitness for use, merchantability, durability or suitability for any particular use intended by Client and Client hereby confirms that Imax has not given any such covenant, representation or warranties. To the extent allowed by applicable law for breach or default by Imax of the provisions of this Agreement, or any applicable statutory provisions, Client's exclusive remedy shall be payment by Imax of damages to a maximum amount equal to, and in no event shall Imax be liable in excess of, the aggregate of the total Initial Rent paid or payable pursuant to Schedule A and any Additional Rent that has been paid pursuant to ꞈhedule A. In no event shall such damage include, ..or shall Imax be liable for, any special, indirect, incidental or consequential damages, even if Imax has been advised of the possibility thereof including, but not limited to, lost profits, lost business revenue, or other commercial or economic loss of any kind, or any damages claimed against Client by any other.

## 11. DEFAULT OF CLIENT

(a) Client acknowledges that time is of the essence under this Agreement therefore, whenever Client shall default in the payment of any installment of the Initial Rent, the Additional Rent or the payment of any other sum payable under this Agreement, or is in default of its material obligations under this Agreement and continues to be in default, or fails to begin to cure such default, within 30 days after Imax has delivered written notice of the default to Client, Imax may, at its election, terminate this Agreement, with or without entry, and all of the rights of Client with respect to the System and the use thereof shall be absolutely forfeited and shall lapse and Client shall pay to Imax its losses and damages. All unpaid amounts due to Imax shall be forthwith paid by Client. Imax shall be entitled to retain all payments made by ꞈlient during the Term and the Minimum Rent for the .expired portion of the Term shall be accelerated based on a discount rate equal to the then current prime rate announced by Imax's principal lender, and shall become

due and be paid upon the demand of Imax. Such amounts shall be paid and/or retained by Imax, as the case may be, as liquidated damages and not as penalty. Client acknowledges that Imax shall have no duty to mitigate its loss if this Agreement is prematurely terminated and Imax has other systems available for lease, however if Imax is able to lease the System which is substantially the subject matter of this Agreement, in mitigation of its loss, the payment to be made by Client in respect of accelerated Minimum Rent will be reduced correspondingly.

(b) The adjudication of Client as bankrupt or insolvent or if it should be put into receivership or a trustee appointed for the benefit of creditors, shall not be deemed to be a material breach by Client of the terms of this Agreement. If Client is otherwise in default of its obligations, Imax may terminate this Agreement immediately upon delivery of notice to Client.

## 12. REMOVAL OF SYSTEM

Client shall fully cooperate in permitting Imax access to the Theatre to regain possession of the System upon the termination of this Agreement. Imax will be permitted access to the Theatre to supervise the removal of the System. Unless the termination of this Agreement is the result of a breach of Imax, all costs of removal and return shipment of the System, excluding any cables, the recovery of which is not economical or practical, but including export packaging, shall be at the expense of Client. Upon any termination of this Agreement, Imax shall, at its expense, supervise the removal of the System from the Theatre. Client shall cause the Projection System and Glasses Cleaning Machine to be returned, properly packaged as required by Imax, to Imax at Mississauga, Ontario, Canada and the Sound System to Sonics Associates at Birmingham, Alabama, or such other location as Imax may reasonably designate, provided the cost of shipping the System to another location shall be no greater than the cost of shipping the System as aforesaid. Except as otherwise provided, and subject to Imax carrying out its agreements with respect to service and maintenance, the System shall be returned in good condition and repair, otherwise Imax may make all repairs and replacements necessary to place the System in good condition and repair, reasonable wear and tear excepted, and Client shall pay the cost of such repairs and replacements upon demand, unless previously paid out of insurance proceeds.

## 13. WARRANTIES OF PARTIES

(a) Each party is legally constituted and validly existing,

Initialled by _TMS_  for Client

Initialled by _____  for Imax

good standing, under the laws of the jurisdiction of its constitution, with adequate power to enter into this Agreement.

(b) This Agreement has been duly authorized by and all necessary action on the part of each party has been taken and constitutes a legal and valid agreement binding upon each party and is enforceable in accordance with its terms.

## 14. GENERAL PROVISIONS

(a) This is a lease Agreement and does not convey to Client any right, title or interest in and to the System other than the right to use it subject to the terms hereof.

(b) Any notices, approvals or other communications required or permitted to be given or delivered hereunder shall, unless otherwise permitted, be in writing and shall be delivered personally, transmitted by telex, facsimile or telegraph, or, except during periods of postal disruption, sent by registered mail, return receipt requested, postage prepaid, to the parties at their respective addresses appearing on the execution page of this Agreement, or at such other addresses as either party may from time to ~ne designate. Any notice, approval or communication ~~ given shall be deemed to have been received on the date on which it is delivered, on the day transmitted if by telex, facsimile or telegraph, or, if mailed, on the 5th business day next following the mailing thereof.

(c) The parties shall give further assurances and do, execute and perform all such acts, deeds, documents and things as may be requisite to enable them to have the full benefit of all rights and remedies intended to be reserved or created hereby or as may be required under the local laws.

(d) Neither party shall be liable to the other for delays in the performance or observance of its covenants or agreements under this Agreement which are beyond its control, including, but not limited to, delays by fires, strikes, carriers, acts of God, war, insurrection, riot, vandalism, theft and any governmental authority. The occurrence of any of the aforesaid events shall not entitle Client to terminate this Agreement or entitle Client to any abatement or reduction of the Additional Rent or other charges payable hereunder, except as provided in Paragraph 9 above.

(e) This Agreement does not constitute and shall not be construed as constituting an agency, partnership or joint venture between Imax and Client.

(f) During the term of this Agreement Client shall permit Imax to use the Theatre in order to demonstrate the System upon reasonable notice to Client and at reasonable times. Client shall not be entitled to any compensation in respect of these demonstrations except for any reasonable additional expenses incurred by Client in order to comply with this Paragraph 14(f).

(g) The terms of this Agreement shall be treated as confidential and, unless required by law, neither Imax nor Client shall disclose the terms of this Agreement. Each party shall, by agreement, instruction or otherwise, take steps with its employees, representatives and legal advisors permitted access to this Agreement, to preserve the confidentiality of the terms of this Agreement.

(h) Any term, condition or provision of this Agreement which may be unenforceable by law shall be severable from this Agreement to the extent of such unenforceability without invalidating the remaining terms and conditions.

(i) Unless otherwise specifically provided herein, all amounts expressed or described hereunder are in lawful currency of the United States of America.

(j) Any overdue payment hereunder shall accrue interest at the rate of the prime rate of interest quoted by Imax's principal lender to its most creditworthy customers, at its head office, from time to time, plus 2% per annum calculated monthly from the date it is due until date of payment.

(k) This Agreement shall be construed according to the laws of the State of Pennsylvania and the parties agree to attorn to the jurisdiction of the courts of Pennsylvania. The parties further agree that the provisions of the Vienna Sales Convention shall not apply to the subject matter of this Agreement.

(l) None of the rights, duties and obligations of either party hereunder may be assigned without the prior written consent of the other, provided that Imax may at any time assign this Agreement to any wholly owned (either directly or indirectly) subsidiary of Imax, so long as such assignee remains a subsidiary. Client shall advise Imax of any change in the effective management or control of Client. No acceptance by Imax of any payments by an assignee shall be deemed a waiver of this covenant or the acceptance of the assignee as the lessee or a release of Client. This Agreement shall enure to the benefit of and be binding upon the parties hereto, their successors and, where permitted or approved, their assigns.

(m) No term or condition of this Agreement can be waived

Initialled by _____ JNS _____ for Client

Initialled by _____ for Imax

:ept by the written consent of the waiving party and any forbearance or indulgence by either party in any regard shall not constitute a waiver of the term or condition to be performed by the other party; and until complete performance by the other party of the term or condition the waiving party shall be entitled to invoke any remedy available to it under this Agreement or at law.

(n) This Agreement represents the entire transaction between the parties relating to its subject matter, and supersedes all prior agreements, negotiations and proposals, written and oral, relating to its subject matter. No agreement purporting to amend or modify this Agreement shall be valid and binding upon the parties unless in writing and signed by both parties.

Initialed by _TAS_____ for Client

Initialed by _____ for Imax

## SCHEDULE C

## SPECIFICATIONS OF SYSTEM AND INSTALLATION
## TESTING AND TRAINING SERVICES

### IMAX ® 3D PROJECTION SYSTEM SPECIFICATION

**1.0   PROJECTION EQUIPMENT**

**1.1   PROJECTOR**

MOVEMENT TYPE:  Dual horizontal rolling loop film transport with fixed pin registration at the aperture.

FILM:  70mm Estar-base motion picture print stock with 4.75mm (0.1870 in) perforation pitch.

FORMAT:  48.5mm by 69.6mm (1.96in by 2.74in) projection aperture, 15 perforations per frame, 24 frames per second.

REGISTRATION ACCURACY:  Typically 0.04% of picture dimension, both for jump and weave.

MAIN SHUTTER:  Shutter integral with rotor.  High efficiency double shutter.

ILLUMINATION SYSTEM:  Dual 15kW xenon short-arc lamp light source lamphouse.  Consists of water-cooled lamp electrodes, four beam-folding dielectric-coated cold mirrors and dowser.

FIELD LENS:  A self cleaning, continuous element, quartz field lens assembly allows continuous cleaning of field lens during projection without interruption of picture.

LENSES: Two C287 wide-angle 12-element lens, or equivalent, f/2.4, 61mm focal length, in a specially-designed mount for the single-projector IMAX 3D format.  Horizontal projection angle 59 degrees, vertical projection angle 42 degrees.

POLARIZING FILTERS:  Two polarizing filters are provided, one for each lens.

POLARIZING PORT ASSEMBLY:  Accommodates clear glass for 2D projection and polarizing filters for 3D projection.  Fitted with cooling fans, and acoustically treated to minimize projector noise transmission into the Theatre.

FILM CLEANING:  A Particle Transfer Roller (PTR) system assembly consisting of two spindle mounted, polyurethane rollers mounted on the input side of the projector.

SOUND SYSTEM INTERFACE:  Interlock drive transmitter provides sound synchronization signal.

Size:  Nominally 1570mm wide by 1930mm long by 1525mm high (62in by 76in by 60in), including lamphouse;
Weight: 950kg (2000 lbs)

**1.2   PROJECTOR TRANSPORTER BASE**

A special base mounting unit to permit fore and aft movement of the projector for film threading and operator access.

**1.3   FILM PEDESTAL (AS REQUIRED)**

Film handling stand designed to allow proper routing and transfer of film to the projector from each of the two reel units. Location in projection room is determined by Reel Unit placement.

**1.4   REEL UNIT (TWO)**

Equipped with four 1220mm (48in) diameter horizontal feed and take-up reels.  Each pair accommodates maximum 60 minutes of film at 24 fps.  Simultaneous projection and rewind by alternating pairs of reels.  Control equipment mounted in an attached enclosure.

Size:  Nominally 1800 mm wide by 1800 mm deep by 1550 mm high (70in by 70in by 61in high);
Weight: 1000kg (2200lbs)

**1.5   SYSTEM CONTROL CONSOLE**

Console houses electrical power distribution and projector system auxiliary equipment controls.  Equipment is operated by an integral PLC (Programmable Logic Controller).

The operator interface is activated by an LCD touchscreen providing controls for regular show operation, system status displays and access to a wide variety of system programming and maintenance functions.

The flexibility of the system allows basic show automation features to be incorporated on a custom basis.

Size:  840mm wide by 1080mm high by 330mm deep (33in X 43in X 13in);
Weight:  120 kg (260 lbs)

**1.6   REMOTE CONTROL STATION**

Portable plug-in console provided for in theatre remote or field lens change, remote lens focus and remote lamp alignment.

**1.7   COOLANT CONDITIONING UNIT**

Consists of a closed circuit distilled water system, turbine pump, filter, deionizer, coolant, heat exchanger, flow, pressure, temperature and level meters, and control interlocks.

Size:  1375mm wide by 610mm deep by 1070mm high (54in by 24in by 42in);
Weight: 340 kg (750 lbs)

**1.8   AIR COMPRESSOR**

Imax will supply one air compressor which requires a service of 35 amps at 208 volts.

Size:  Each unit is nominally  1100mm wide by 530mm long by 760mm high (44in by 21in by 30in);
Weight: 200 kg (450 lbs).

Initialled by _TMS_ for Client                                          Initialled by _____ for Imax

## SCHEDULE C

## SPECIFICATIONS OF SYSTEM AND INSTALLATION, TESTING AND TRAINING SERVICES

**1.9   RECTIFIER (TWO)**

Each unit has a 450 ampere, 18kW power output with integral fan cooling. Heat rejection to room 6 kW nominal per rectifier.   NOTE: The stated tolerance in theatre supply voltage applies to the safe and reliable operation of the equipment.   Output current of the rectifier may vary slightly over the specified range of input voltage.

Size: Nominally 1450mm depth by 610mm wide by 790mm high (57in by 24in by 31in);
Weight: 660 kg (1500 lbs).

**1.10   PROJECTION ROOM EQUIPMENT PACKAGE**

An equipment package is provided which includes four 15kW xenon lamps [two in the lamphouse and two spares], one 70mm film tape splicer, hand rewind equipment, safety equipment, and miscellaneous supplies.

**1.11   ELECTRICAL STANDARDS**

The projection system will be built to meet the requirements of the Canadian Standards Association. Wherever possible components approved by the Canadian Standards Association or Underwriters' Laboratories are used.  If appropriate, inspection and approval shall be confirmed by the affixed label of Special Acceptance by the Canadian Standard Association.  The projection system will also be built to comply with applicable United States law.

**2.u   SCREEN ASSEMBLY**

The IMAX 3D screen assembly will consist of a aluminized perforated vinyl projection surface mounted on a tubular steel frame and supporting structure.   Screen surface will be painted with a proprietary, non-depolarizing aluminized coating.

**GEOMETRY**
Established to suit the Theatre and the Projection System, so as to present the audience with the maximum projected image within the limits of the building design.

**SIZE**
Nominal dimensions are as follows, with final size being determined by theatre geometry:
Bottom Chord Width:     25 meters    (82 feet)
Height:                          18.3 meters  (60 feet)

**STRUCTURE**
Self-supporting, with all vertical loads carried to the floor.  Lateral bracing to the building will be necessary at a number of points to the wall behind the screen.

Will support the sound system loudspeaker units, and will provide climbing access to them for maintenance.

**3.0   SOUND SYSTEM**

**3.1   DIGITAL SOUND SOURCE**
6-track digital disc player, interlocked to the projector and also capable of independent operation.  Maximum playing time is one hour.

**3.2   ANALOG SOUND SOURCE**
35mm six-track dubber, interlocked with the projector and also capable of independent operation.   Equipped with a pre-amplifier for each channel. Maximum playing time is one hour.

**3.3   ELECTRONIC EQUIPMENT:**
Includes a one-third octave programmable equalizer for each channel, power amplifiers for each channel, a sub-bass channel with amplifiers and loudspeakers, a control and switching unit to select inputs and provide master and remote theatre sound level controls.

Provides six separate output channels, a combined sub-bass output and a combined full frequency range output or individual channel outputs to the projection room monitor system, a projection room monitor amplifier and loudspeaker, together with a jack panel interconnecting the system elements, allowing changes of configuration and independent testing of various system elements.

**3.4   LOUDSPEAKERS:**
Loudspeaker clusters will be configured using commercial quality drivers, properly time-aligned and capable of handling high power levels, mounted in custom-designed proprietary enclosures.

**LOUDSPEAKER LOCATIONS:**
Channel 1 –          Theatre Left Rear
Channel 2 –          Screen Left
Channel 3 –          Screen Centre
Channel 4 –          Screen Right
Channel 5 –          Theatre Right Rear
Channel 6 –          Screen Top Centre
Sub-bass –          Behind Screen

**3.5   ADDITIONAL FEATURES:**
Intermission program input, using a two-track cassette tape player and compact disc player.
Two microphones for voice input: one from front of the theatre and one from projection room.
Microphone mixer with connections for microphones at the front of the theatre.
Sound monitor in projection room to monitor sound in the auditorium.
Sound source and controls for lobby sound system, and one microphone for voice input at entrance to theatre.
Intercom facility between projection booth, ushers station in theatre and lobby.
FM wireless hearing assistance system.

**3.6   PERFORMANCE:**
When used in an IMAX ® theatre built to comply with the Imax acoustical specifications and to other design criteria of Imax, the sound system is capable of the following:

Producing at least 100 dB(A) program loudness, using pink noise input, band-limited approximately to the range 300 Hz to 8kHz, averaged at five positions near the centre of the seating area.

Initialled by _TNS_ for Client                                      Initialled by _____ for Imax

# SCHEDULE C

# SPECIFICATIONS OF SYSTEM AND INSTALLATION TESTING AND TRAINING SERVICES

**3.6** **PERFORMANCE:** (continued)

Frequency response flat within ± 3 dB from 80 Hz to 2 kHz, with a smooth roll-off of approximately - 3 dB per octave from 2kHz to 12.5 kHz (ISO/SMPTE standard), measured at the centre of the audience. A sub-bass system will be provided, operating in the range of 20 Hz to 80 Hz, with frequency response ± 5 dB at 20-80 Hz.
Sound pressure levels throughout audience area to be as uniform as practical taking into account any architectural constraints which may exist. Target uniformity ± 3 dB for channels 2, 3, 4 and 6; and ± 6 dB for channels 1 and 5.

**4.0** **GLASSES CLEANING SYSTEM**

A custom-designed glasses cleaning system, a suitable quantity of custom-built cleaning trays and cardboard distribution trays, one starter kit of cleaning solutions and related supplies will be provided. The equipment is to be installed in a room located near the theatre.

CLEANING MACHINE: A conveyor-style cleaning machine to accommodate loading, cleaning, and unloading of polarized glasses. Nominal glasses throughput of 3000 pairs per hour.

SIZE: 3200mm length by 610mm width by 2160mm height (126in by 85in by 24in).

**5.0** **PROJECTIONISTS TRAINING**

Training will be provided for up to four (4) projectionists at the time of installation. Training of these projectionists will be done simultaneously and will normally take three (3) weeks. Some of this training time may be concurrent with the System installation.

Additional training will be provided for up to two (2) new projectionists, on an annual basis in conjunction with a regular service visit. This training period will be for approximately one (1) week, and presumes existing trained projectionists are available to provide ongoing supervision of newly trained staff.

Training will include: system operation, film presentation, print assembly and inspection, routine cleaning schedules, sound system performance, and projection system performance.

Imax sets the following qualifications for projectionists:

1.   Required to have a technical background gained through a post-secondary school education in technical disciplines plus several years experience in a technical environment, or a combination of both.

2.   It is desirable to have a knowledge of motion picture film presentation, or a number of years of experience gained in full-time employment in fields related to the presentation of quality shows to live audiences.

**6.0** **PROJECTION SYSTEM TESTING**

Following is an outline of the basic procedure carried out by Imax personnel or their designated representatives during System installation.

**6.1** **PROJECTOR**

General visual inspection:
- all packing removed, paint not marked, rotor true, etc.
Check the following:
- ground connection secure, and all electrical connections tight.
- all rollers freewheel, and all roller decals correct.
- all belt tensions correct.
- air jet timing correct.
- all clearances.
- all surfaces smooth.
- cam timing correct.
- input/output sprockets correct and tight.
- frame line indicators correct.
- motor rotation correct.
- vacuum fans operating.
- film cleaner motors operating correctly.
- normal rotor start/stop times correct.
- emergency rotor stop time correct.
- hood switch interlocks function correctly.
- field flattener operates correctly.

**6.2** **LAMPHOUSE**

General visual inspection:
- all packing removed, mirrors in good condition, etc.
- test emergency stop switches.
Check the following:
- all electrical connections tight.
- cover safety interlock switches function correctly.
- lamp power cable polarity.
- lamp power cable polarity.
- mirror alignment.
- exhaust interlock functions.
- air pressure switch operates correctly.
- dowser operates correctly from console and test switch, and speed switch/ dowser lamp interlock operates correctly.
- check UV filter/condenser lens and install.
- install lamp.

**6.3** **REEL UNIT**

General visual inspection:
- all packing removed, surface finish, etc. not marked.
- test emergency stop switches, emergency stop brake tensions and microswitch operation.
- ground connection secure, all electrical connections tight, battery charge current.
- all relays secure, all contactors operate freely.
- proper operation and rotation of all reels.
- all rollers freewheel.
- operation of rewind arm shut-off switches.
- service lamps functional.
- reel unit control panel indicator lamps all function and correct.
- rewind speed control operates correctly.
- all decals correct - rollers and rewind speed.
- all platters smooth and flat.

_TBB_ for Client

Initialled by _____ for Imax

## SCHEDULE C

## SPECIFICATIONS OF SYSTEM AND INSTALLATION, TESTING AND TRAINING SERVICES

**6.4   SYSTEM CONTROL CONSOLE**

General visual inspection:
- all packing removed, no damage to touch screen or surfaces.
Check the following:
- all PLC modules securely in place.
- no loose cable or plugs.
- ground connection secure, and electrical connections tight.
- emergency stop switch.

**6.5   RECTIFIER:**

General visual inspection
- no damage in shipment, paint not marked, etc.
Check the following:
- ground connection secure, and AC power connections tight.
- voltage jumpers correct for available mains.
- DC connections tight.
- contactor connections tight.
- internal splice connections tight.
- fan freewheels.
- both control switches to "REMOTE".

**6.6   POLARIZING PORT ASSEMBLY:**

Check the following:
- ground connection secure, and AC power connections tight.
- blower(s) function properly
- alignment port acceptable

**6.7   POLARIZERS:**

General visual inspection
- no damage in shipment, no scratches on surface.

**6.8   3D SCREEN ASSEMBLY:**

Visual inspection of screen towers and frame.
- ensure installation complete and all connections secure.
- ensure screen sheet has been hung and tightened properly, with no visible wrinkling.

**6.9   SYSTEM CHECK**

Check the following:
- operation of all controls and functions.
- reel deck select operates from console.
- projector run/reel unit interlocks function correctly.
Check both sets field lens optics and install.
Check main lens and install.
Ignite lamp and adjust
- operating current.
- lamp and mirrors for optimum screen illumination.
Run lamp at operating current for minimum of one hour:
- check all DC connections not overheating.
- check mirrors not damaged.
- check rectifier - AC wiring functioning with no signs of overheating.

**6.9   SYSTEM CHECK** (continued)

Thread test loop and check:
- focus motor functional.
- steadiness.
- no ghosting.
- illumination acceptable.
- wiper bars function properly.
- and verify no film damage after 1000 passes.
Thread test film from reel unit and check
- proper reel unit operation, both levels.
- emergency stop works with no film damage running from either level.

**6.10   GLASSES CLEANING SYSTEM**

Check the following:
- no damage during shipment.
- ground connection secure, and electrical connections tight.
- all plumbing connections secure.

**7.0   SOUND SYSTEM TESTING**

The following is an outline of the basic procedure carried out by Imax personnel or their designated representative

**7.1   THEATRE CHANNEL AND SUB-BASS LOUDSPEAKERS:**
Visual Inspection:
- Speaker cabinets visually inspected for transportation damage.

Electrical Inspection:
- Perform full range sweep at 10 dB below maximum level and evaluate with program material.

**7.2   MONITOR LOUDSPEAKER:**
Subject each loudspeaker to a listening test.

**7.3   SYSTEM AMPLIFICATION:**
Test amplifiers for transportation damage.
Check DC offset at speaker output terminals.
Evaluate with program material.

**7.4   SOUND SOURCE - Digital Disc Player ("DDP")**

Visual Inspection - check the following:
- Disc path components operate freely and show no signs of shipping damage.
- Transport drawers are positioned properly and move freely.
- All connectors are firmly seated and cables properly routed.

Mechanical Inspection:
- Load unit with program test or discs and test all transport functions.

Electrical Inspection:
- Load ID test discs and insure all channels are properly assigned.

Initialled by _JPS_ for Client

Initialled by _____ for Imax

## SCHEDULE C

## SPECIFICATIONS OF SYSTEM AND INSTALLATION TESTING AND TRAINING SERVICES

7.5     SOUND SOURCE - Audio Film Reproducer ("Dubber")

Visual Inspection - check for the following:
- Presence of all roller arms, heads, and shields.
- Tape path components operate freely and show no signs of shipping damage.
- Tension arms are positioned properly and move freely.

Mechanical Inspection:
- Clean and demagnetize heads and tape path.
- Load unit with test tape and test all transport functions.

Electrical Inspection:
- Load ID test tape and insure all channels are properly assigned.
- Load SMPTE test tape and check the operating level (adjust if necessary).
- Check the frequency response (and adjust if necessary) using procedure as suggested by reproducer electronics manufacturer.

7.6     THEATRE AUDIO CONTROLLER

Visual Inspection:
- check and/or perform the following
- Cards are seated in the proper slots.
- Power supply is set to the proper line voltage.

Electrical Inspection:
- Apply power and verify proper indication of voltage present LED's.  Check for ±15 volt at mainframe power connector.
- Using test tones and/or program material, as appropriate, test for proper operation.
- Apply the test signal(s) to each input channel one at a time, and check for the presence of the test signal at each output, insert point and patch bay jack associated with that channel.
- Check for proper operation of the program inputs, PA inputs, Sub-bass and Monitor Mix busses.
- Check for proper operation of all user and set-up controls.  Adjust the set-up controls as appropriate for the system.

7.7     TWO-TRACK NON-SYNC PROGRAM SOURCE

Perform the following for the 8-Track Player and for the Digital Disc Player:
- Check for proper line voltage selection.
- Apply power and visually inspect all indicator lamps.
- Test transport functions.

7.8     CUE-COMMUNICATION SYSTEM

Check the following:
- proper voltage selection.
- system call functions.

- apply power to each unit and visually check all indicators.
- ensure system operates free of hum or buzz.

7.9     PATCH BAY

Check for physical damage.
Check from input to termination with test tones, DC voltage or program material, as appropriate.

7.10    MULTI-PIN CONNECTOR

Use a DC probe to verify connection from connector to final termination.
Check for opens or shorts.
Check pin seating and strain relief.

7.11    SYSTEM CHECK

Run sound source(s) to ensure proper synchronization with projection system.

*IMAX PROGRAM OF PRODUCT DEVELOPMENT*

*In keeping with its policy of continual technical improvements of its projection systems, Imax may develop equipment which modifies part or all of these specifications, subject to the provisions that:*

*i)      The perceived image and sound quality will not be reduced in any way from that specified.*

*ii)     The equipment parameters (function, size, weight, utility requirements) will not substantially impact on the operation of the theatre as may be stated herein.*

Initialled by _TNS_____ for Client

Initialled by _Till____ for Imax

## SCHEDULE D

# ELECTRICAL, MECHANICAL AND ACOUSTICAL REQUIREMENTS TO BE PROVIDED BY CLIENT

#### IMAX® 3D PROJECTION SYSTEM

Services and other requirements shown herein are for EACH item of equipment. When quantity is stated as being two (2), then services or other requirements are to be doubled unless otherwise noted.

**1.0 ENVIRONMENTAL CONDITIONS**

**Projection Room**
Temperature range: 18-27 deg C (65-80 deg. F)
Relative humidity:          40-60%

The projection room must be maintained under positive pressure of approximately 0.05 in. w.g. differential to the adjacent areas at all times.

Air to the projection room and all film handling and storage areas must have a two-stage filtration, using appropriately sized Farr 2 inch 30/30 as prefilters and Farr RIGA-FLO 200 as final filters. Imax approved equivalent units are acceptable, provided the result is not less than 95 percent on ASHRAE test 52076.

Must be maintained 24 hours per day, 365 days per year. See Section 3.2 Exhausted air must be considered when selecting air conditioning system in order to maintain these conditions.

**Equipment Room**
Operating temperature:          18-27 deg C (65-80 deg F)
Non-operating temperature:    8-32 deg C (50-90 deg F)
Relative humidity:                   65% maximum

**Glasses Cleaning Room**
Operating temperature:          18-27 deg C (65-80 deg F)
Relative humidity:                   40-65%
Non-operating temperature:    8-32 deg C (50-90 deg F)
Room exhaust required:          24 L/sec (50 cfm)

The room must be located near the theatre, be suitably sized to accommodate the glasses cleaning machines, and contain or be in close proximity to either a dumbwaiter, elevator or conveyor to facilitate movement of the glasses. Determination of room size and location shall be done in consulation with Imax so as to ensure an efficient flow path for the issuance, retrieval, cleaning and reissuance of glasses.

**Theatre**
Temperature range during
installation and operation:      18-27 deg C (65-80 deg F)
Relative humidity:                   40-60%
Non-operating temperature:    8-32 deg C (50-90 deg F)

**Failure to maintain the above environmental conditions may result in damage to film or projection system.**

**2.0 SERVICES AND STRUCTURAL**

**2.1 General**

Theatre Electrical Supply: 208 volts, 60 Hz, 3-phase, 4-wire.

Voltages shown are as understood at the time of preparation of this schedule. Different input voltages may be established after consultation with the architect and consulting engineers.

Supply voltage variation must not exceed ± 5% of normal supply voltage measured at the input terminals to Imax-supplied equipment over the range of no load to full rated load.

If this condition can not be met, then voltage regulators approved by Imax shall be supplied as part of the building.

**2.2 WIRING AND OTHER CONNECTIONS**

Client to provide:
All power circuits as more particularly described herein or on Imax-supplied drawings.

All wiring, raceways and conduits required to electrically connect the various components of the System.

Client shall arrange for his electrical contractor to pull all specialized control or other cables supplied by Imax for the projection system, glasses cleaning unit, and sound system.

Client shall arrange for his general contractor to pull air, water, and exhaust hoses (supplied by Imax) required for the connection of certain equipment.

All above in accordance with drawings and information to be supplied by Imax.

**3.0 EQUIPMENT**

**3.1 PROJECTOR**

Power supplied from System Control Console.

**3.2 PROJECTOR EXHAUST FAN**

An induced draft (suction) fan to be provided by client as part of the building. Fan must be rated to remove 700 L/sec (1500 cfm) through lamphouse which imposes a restriction of -150 Pa (0.6 in) water static pressure measured at the projector in addition to duct and all other losses. Fan selection is critical - see relevant Design Facts Sheet for details or consult Imax.

**3.3 PROJECTOR EXHAUST DUCTWORK AND CONNECTIONS**

All ductwork, mountings, connections and electrical wiring to incorporate projector exhaust fan into the building, and connection of umbilical junction box.

Initialled by ⟨TNS⟩ for Client

Initialled by ⟨signature⟩ for Imax

## SCHEDULE D

## ELECTRICAL, MECHANICAL AND ACOUSTICAL REQUIREMENTS TO BE PROVIDED BY CLIENT

3.3   **PROJECTOR EXHAUST DUCTWORK AND CONNECTIONS** (Continued)

Ductwork between umbilical junction box and projector, per Imax drawings.

All details of ductwork, fan mounting and connections to be approved by Imax prior to execution.

3.4   **SYSTEM CONTROL CONSOLE**

Requires 208 volt, 60 Hz, 3-phase, 4-wire, 100 ampere supply circuit. Separate unit adjacent to the projector, which supplies power to projector, coolant conditioning unit, and reel units.

3.5   **RECTIFIER (TWO)**

Requires 208 volt, 60 Hz, 3-phase, 4-wire; 200 ampere supply circuit. Heat rejection to room approx. 6 kW. Cooling air flow induced by integral fan;  recirculates 600 L/sec.(1,200 cfm) room air.

3.6   **COOLANT CONDITIONING UNIT**

Power supplied from the System Control Console.
Heat exchanger requires 0.7 L/sec. (10 US gpm) minimum cooling water, at maximum inlet temperature of 20 deg. C (70 deg. F) and minimum pressure of 140 kPa (20 psi). A chiller must be provided as part of the building system to supply this water.

3.7   **AIR COMPRESSOR**

Requires 208 volt, 60 Hz, 3-phase, 4-wire; 35 ampere supply circuit. Includes 10 hp (7 kW) motor. Air intake requires 18 L/sec. (38 cfm) at 65% maximum relative humidity. Heat rejection to room approx. 7.9 kW.

3.8   **REEL UNIT (TWO)**

Power supplied from the System Control Console. Heat rejection to room approximately 2.7 kw each.

3.9   **REMOTE CONTROL STATION**

Client shall provide a suitable location where remote controls for field lens changes and other projector functions can be installed. The selected location must have a clear view of the screen.

3.10   **AIR RECEIVER**

Client to supply 450 L (120 US gal) capacity air receiver as part of the building. Vertical tank approximately 24 in. (610 mm) diameter by 78 in. (2000 mm) high; working pressure 1000 kPa (150 psi). Must comply with local pressure-vessel code. Drain provision required for condensate.

3.11   **GLASSES CLEANING UNIT**

Requires 208 volt, 60 Hz, 3-phase, 4-wire, 100 ampere supply circuit.   Client to supply clean, cold water supply, approximately 30 L/hour (6 US gpm), containing total dissolved solids of less than 15 parts per million. A drain or return provision for this water, and moist air exhaust duct to properly handle the system demands must also be supplied. Imax Corporation will provide detailed information as to the specific requirements.   **Failure to meet the above requirements may result in poor performance or damage to the glasses cleaning unit.**

Client to supply a room in the theatre, sized approx. 450 sq.ft. minimum. Layout to be approved by Imax.

Client shall provide all solutions required in the cleaning and rinsing stages, in accordance with the recommendations made by Imax Corporation.

Imax will assist in developing cleaning and handling procedures, designed to meet the operational requirements of the theatre.

3.12   **SOUND SYSTEM**

Requires 208 volt, 60 Hz, 3-phase, 4-wire, 100 ampere supply circuit; MUST HAVE dedicated Isolated Audio Ground System.

Client shall provide all a.c. power circuits for the sound system, and all raceways and conduits required for the sound system, in accordance with drawings and information to be supplied by Imax.

Client shall provide, as part of the building, all structural pick-up points for the loudspeaker clusters, as well as catwalks, ladders or other agreed methods of reaching the loudspeakers for maintenance, and shall also provide a mounting platform to support the sub-bass loudspeaker array at the proper height.  Information concerning loads and locations will be supplied by Imax.

If client wishes to utilize the sound system's capability for lobby paging and background music, then client shall install the wiring and provide the necessary loudspeakers in accordance with information and drawings to be provided by Imax.  Installation of these items must be coordinated with theatre electrical work and installation of the lobby ceiling.

Imax will supply all specialized loudspeaker, microphone and control cables required, which are to be pulled in the above raceways and/or conduits by the client's electrical contractor.

Imax will supervise installation and connection of the sound equipment, using appropriately skilled labour supplied by the client.

Initialled by _TNS_   for Client

Initialled by _____ for Imax

## SCHEDULE D

## ELECTRICAL, MECHANICAL AND ACOUSTICAL REQUIREMENTS TO BE PROVIDED BY CLIENT

**3.13    3D SCREEN PAINTING**

Client to supply all materials and labour required to assemble and dis-mantle the 3D screen painting equipment as per information and instructions supplied by Imax.

Imax will confirm power and compressed air requirements for the painting equipment. Client to supply a suitable temporary location in the theatre, minimum of 200 sq. ft to accommodate the screen painting equipment.

**4.0    ACOUSTICS AND NOISE CONTROL**

**4.1    GENERAL**

The acoustical environment of the theatre is a vital element of an IMAX experience. The environmental "ambience" and stereophonic effects have already been created on the film sound track and should be subject to minimum coloration by the theatre acoustics.

Because an IMAX theatre is not a live performance theatre, the acoustical design should not be based on classical theatre or concert hall criteria. For example, flutter echoes must be avoided and discrete reflections from hard or untreated surfaces should be held to an absolute minimum.

**ACOUSTICAL CONSULTANT, REVIEW AND APPROVAL**

Client shall engage a specialist acoustical consultant, satisfactory to Imax, to collaborate with the architect on acoustical design and noise control. The resultant acoustical design shall be submitted to Imax for review and written approval, and any corrections or changes deemed necessary in the opinion of Imax shall be incorporated into the final design and construction of the Theatre.

**4.3    NOISE CONTROL**

The Theatre shall be designed and constructed to a noise criteria figure of NC-25 with no single tones or discrete sources discernable. To achieve this, the external noise environment must be evaluated and attention must be paid to the sound transmission loss characteristics of walls, ceilings, floors, doors, windows and other perimeter elements.

There must be adequate isolation from other noise sources within the building itself, including machinery such as fans, pumps and air-conditioning units. Ducts and grilles shall be sized for low noise performance and ducts will need to be lined and/or provided with silencers, in accordance with current state-of-the-art practice to meet the specified noise criterion figure.

Reverberation time ($RT_{60}$) for the theatre shall be in the range of 0.5 to 0.7 seconds at 500 Hz and above. Because of the difficulty of achieving adequate absorption at low frequencies, it may be allowed to rise smoothly to not more than 140% of the 500 Hz value at 125 Hz, in accordance with Figure 1.

While isolated measurements of reverberation time may exceed the target by a maximum of +25%, reverberation times below the target value are acceptable, provided the curve is smooth, without sharp peaks or valleys, and the reverberation time does not becomes excessively short.

**4.4    ELECTROACOUSTIC RESPONSE**

The electroacoustic response of the sound system (including amplifiers, screen and loudspeakers) in the completed Theatre will be adjusted by Imax to conform as closely as possible to the electroacoustic curve and tolerance in Figure 2. Average response will be measured at centre of seating area.

It is understood, and of particular importance, that the acoustical characteristics of the Theatre must be correct before any attempt is made to adjust the response electrically.

**5.0    LABOUR**

Client to provide all labour and material required for installation of the projection and sound systems, the screen, the glasses cleaning equipment and set-up and dismantling of screen painting equipment.

**6.0    COMPLETION OF PROJECTION BOOTH AND THEATRE**

It is a requirement of this contract that, prior to the commencement of installation, the Theatre, the projection booths and auxiliary equipment room(s) be in a satisfactory state of completion.

Projection system, screen, glasses cleaning equipment, and sound system, shall be moved into a clean, dust-free, finished environment with walls, ceilings and floors sealed, painted and/or covered as provided in the design. INSTALLATION WILL NOT COMMENCE UNTIL ALL SERVICES INCLUDING ELECTRICITY, DOMESTIC WATER, CHILLED WATER, HEATING AND AIR-CONDITIONING, AS CALLED FOR IN THIS SCHEDULE, ARE OPERATIONAL ON A FULL-TIME BASIS.

Installation of wiring for loudspeakers, erection of the screen towers and frames, hanging of loudspeaker clusters, and hanging or other means of attachment of the screen sheet shall be co-ordinated with other work in the Theatre and shall not commence until the Theatre is sufficiently complete, in the sole opinion of Imax, for such work to proceed under proper conditions of cleanliness and access.

*The information contained in this schedule is accurate as of the date hereof. However, in keeping with its policy of continuing technical improvement and/or modifications to the equipment or building, Imax may, upon reasonable notice to the client, alter or amend any of these requirements so as to provide suitable conditions for the proper functioning of the System.*

lied by _____ for Client

Initialled by _____ for Imax

Harrisburg, Pennsylvania, IMAX® 3D Theatre / 1996.05.08

## SCHEDULE D

## MECHANICAL, ELECTRICAL AND ACOUSTICAL REQUIREMENTS
## TO BE PROVIDED BY CLIENT



IMAX® THEATRE REVERBERATION TIME



IMAX® THEATRE ELECTROACOUSTIC RESPONSE

Initialled by _____ for Client

Initialled by _____ for Imax

## SCHEDULE E

## SPECIFICATION FOR SOURCING
## IMAX® 3D POLARIZED VIEWING GLASSES

### INTRODUCTION

It is vitally important that glasses for viewing IMAX 3D films meet three performance criteria: give proper separation between the right-eye and the left-eye images, provide a wide field of view consistent with the scale of the IMAX image, and be comfortable to wear. To reduce operating costs, glasses are normally reused after having been sanitized by means of a wash, rinse and dry process.

In the specification that follows, requirements for lens size, performance and viewing comfort are absolute and must be met as a condition of use with the IMAX 3D Projection System; some leeway may be allowed in the frame details. Performance of 3D glasses supplied by third parties is subject to Imax's prior approval, by way of (a) review of the details of the proposed design and manufacture, and (b) evaluation of representative samples of the glasses before acceptance.

The client should understand that the quality of manufacture will have a direct bearing on the ability of the glasses to withstand continual handling as well as the wash/rinse/dry process, and hence on the number of reuses that can be attained.

Imax accepts no responsibility for the durability or performance of 3D glasses supplied by third parties.

### GENERAL

The IMAX 3D Projection System utilizes one projector with two lenses, one for the right-eye image and one for the left-eye image. Light from the projector is polarized by filters in front of each projection lens, with each filter axis set at 45 degrees from vertical and at 90 degrees to one another. The audience views the picture through polarized glasses, of which the lenses have polarization axes that correspond to those of the projector filters. Thus, the right eye of each viewer sees the projected right eye image, but not the left eye image; and the left eye of each viewer sees only the corresponding projected left eye image.

The screen-to-audience relationship in an IMAX theatre is such that each member of the audience has a wide field of view. This requires that the glasses frames must not obstruct the wearer's view of the picture.

The IMAX 3D projection system presents a high quality, high definition picture. The viewing glasses must therefore be of comparable quality, free from distortion and imperfections, so the overall presentation is the very best possible.

### 1.0 FRAME CHARACTERISTICS

1.1 Openings for lens, spacing of lens elements and general design must be in accordance with Imax Drawing available on request.

1.2 Plastic moldings with fixed temple pieces (arms) and suitable pocket to locate, index and secure the polarized lens elements.

1.3 Plastic moldings to be ultrasonically welded, to produce an integral assembly of frame and lenses. This assembly must be designed and manufactured to ensure that cleaning fluid cannot enter and become trapped within the frame.

1.4 Lightweight and comfortable for wear by adults and children, and able to fit over prescription eye-glasses. Temple pieces must curve inward to provide secure and comfortable clamping over the full range of head sizes. Clamping force of 30 grams ± 10 grams.

### 2.0 POLARIZED LENS ELEMENTS

2.1 Lens material must be Polaroid HN-38S or equivalent, as specifically approved by Imax. The specified lens material is a neutral colour linear polarizer sandwiched between two protective layers of base material to protect polarizing crystals.

2.2 Transmission and extinction over the entire area of the lens (typical values measured using sample of the polarizing material):

Total Transmission with two layers of polarizing material and axes aligned for maximum transmission: = 27% minimum (axes parallel)

Total Transmission at Extinction with two layers of polarizing material and polarizing axes aligned for minimum transmission: = 0.02% maximum (axes crossed)

2.3 Orientation of axes of the polarization axes to be in accordance with Imax Drawing No. 9441-A, referenced in item 1.1 above.

2.4 All measurements are to be made with a Minolta Luminance Meter or a meter with similar spectral response.

Initialled by _____ for Client

Initialled by _____ for Imax

## SCHEDULE E

## SPECIFICATION FOR SOURCING
## IMAX® 3D POLARIZING VIEWING GLASSES

**3.0    CLEANING**

3.1    It is intended that 3D viewing glasses will be cleaned and reused, therefore they must be designed and manufactured so as to ensure that this can be done without damaging or inhibiting the performance of the glasses.

**4.0    LIFESPAN**

4.1    3D eyeglasses can be expected to have a lifespan of approximately 10-15 uses.  This figure is based on a number of factors including: quality of glasses, handling by audience member, and handling care during the distribution, cleaning, storage and redistribution by theatre staff.

4.2    Imax can provide a Technical Information Sheet listing factors to be considered when determining the quantity of glasses required for initial start-up and ongoing operation.

**5.0    SAMPLES - SUBMISSION FOR TESTING AND APPROVAL**

5.1    Samples of the proposed 3D viewing glasses shall be submitted to Imax for testing and approval and that they fully meet the specifications stated herein, including the capability of being successfully cleaned in the Imax-supplied Glasses Cleaning System and reused without decrease in their performance.

5.2    Samples must be submitted no later than four (4) months prior to the earlier of the theatre opening date as first defined in the contract or as may be subsequently agreed to by Imax and Client.

The amount of time specified is to allow for receipt, testing and approval or return to client's supplier if modifications are required, plus resubmission to Imax for final testing and approval, and then supplier's manufacture the glasses in quantity.

5.3    It is recommended that a minimum of six (6) samples be provided for testing.  If Client is having more than one supplier bid on supply of these glasses, then six (6) samples from each supplier should be provided.

Initialled by _____ for Client

Initialled by _____ for Imax



SCHEDULE F
Box Office Report

For the Month of

FILM 1:

**Ticket Prices**

Adult  Senior  Children  Group  Double Feature  Combination

**NUMBER OF TICKETS SOLD**

| DATE | # of Shows | Adult | Senior | Children | Group | Double Feature | Combination | Total |
|---|---|---|---|---|---|---|---|---|
| 1-JAN | | | | | | | | |
| 2-JAN | | | | | | | | |
| 3-JAN | | | | | | | | |
| 4-JAN | | | | | | | | |
| 5-JAN | | | | | | | | |
| 6-JAN | | | | | | | | |
| 7-JAN | | | | | | | | |
| 8-JAN | | | | | | | | |
| 9-JAN | | | | | | | | |
| 10-JAN | | | | | | | | |
| 11-JAN | | | | | | | | |
| 12-JAN | | | | | | | | |
| 13-JAN | | | | | | | | |
| 14-JAN | | | | | | | | |
| 15-JAN | | | | | | | | |
| 16-JAN | | | | | | | | |
| 17-JAN | | | | | | | | |
| 18-JAN | | | | | | | | |
| 19-JAN | | | | | | | | |
| 20-JAN | | | | | | | | |
| 21-JAN | | | | | | | | |
| 22-JAN | | | | | | | | |
| 23-JAN | | | | | | | | |
| 24-JAN | | | | | | | | |
| 25-JAN | | | | | | | | |
| 26-JAN | | | | | | | | |
| 27-JAN | | | | | | | | |
| 28-JAN | | | | | | | | |
| 29-JAN | | | | | | | | |
| 30-JAN | | | | | | | | |
| 31-JAN | | | | | | | | |

**GROSS BOX OFFICE REVENUE**

Adult  Senior  Children  Group  Double Feature  Combination  Total

Initialed by _____ for Client

Initialed by _____ for Imax

## SCHEDULE G
## EXCLUSIVE RIGHTS

The Whitaker Center for Science and the Arts IMAX® 3D Theatre

1.  Imax shall not open or permit to open any theatre utilizing Imax technology within the area defined by the Pennsylvania counties of: Dauphin, Lancaster, Lebanon, York, Cumberland, Adams, Berks and Perry (the "Territory") for a period of two (2) years from the date on which the Theatre is opened, provided that such exclusivity will in no event extend beyond April 1, 2002.

2.  The sole and exclusive right granted under Paragraph 1 above shall not extend to:

    (i)     any theatre utilizing motion seats/platforms for a simulation experience;
    (ii)    any destination theatre exhibiting a single film for at least 90% of its annual programming;
    (iii)   "specialty theatres" which are theatres utilizing special technology or special effects, including, without limitation, IMAX *Magic Carpet®* and/or IMAX *Solido®*, provided these theatres do not use films from the generally available 2D or 3D IMAX film library for greater than 20% of their annual programming;
    (iv)    any commercial theatre, provided that Imax will not open or permit to open any 3D Theatre at Hershey Park, Pennsylvania unless such theatre is either a "specialty theatre" or a "destination theatre"; and
    (v)     any commercial or institutional theatre developed in relation to the Gettysburg Military Park.

3.  In the event of any default by Client and/or its assignees of its representations, warranties, covenants or any other obligation under this Agreement then the provisions of this Schedule G shall automatically terminate and Imax shall be under no further obligation to maintain these exclusive rights in favour of Client.

# EXHIBIT B

BIND

CORPORATE HEADQUARTERS AND TECHNOLOGY CENTRE
2525 Speakman Drive, Sheridan Park
Mississauga, Ontario, Canada L5K 1B1
Telephone: (905) 403-6500 Fax: (905) 403-6450

# IMAX CORPORATION

March 19, 1998

The Whitaker Center for Science and the Arts
17 South Second Street
5th Floor
P.O. Box 11433
Harrisburg, PA.
17108-1433

Dear Sirs:

RE:  AMENDING AGREEMENT NO. 1 - System Lease Agreement
         IMAX® 3D Theatre, Harrisburg, Pennsylvania

         AGREEMENT FOR IMAX ® 3D                          (FOS)
         PROJECTION SYSTEM AND TRADEMARK

This letter will confirm our agreement to amend the existing system lease agreement between Capital Center for the Arts, Science and Education, Inc. ("Client") and Imax Corporation ("Imax") dated as of June 18, 1996 (the "Original System Lease Agreement") regarding the lease of an IMAX® 3D Projection System.

We have agreed to amend the Original System Lease Agreement by deleting the requirement for the letter of credit in Part II of Schedule A and replacing it with the following:

"Payment (vi) above, is to be paid by draw down on an irrevocable Confirmed Letter of Credit in a form and drawn on a bank acceptable to Imax, to be issued by Client on the date that is 3 months prior to the Delivery Date, which Letter of Credit shall expire no earlier than 30 days following the date installment (vi) is payable. The Letter of Credit shall provide for payment to Imax on the above-noted date upon presentation of a standard commercial invoice by Imax for the above-noted amount, together with a certification that Imax is not then in default of any obligation under this Agreement."

Except as specifically amended by this Agreement, capitalized terms used in this Agreement shall have the same meaning ascribed to such terms in the Original System Lease Agreement. Except as modified by this Agreement, all terms of the Original System Lease Agreement remain unaltered and all terms, including those modified hereby, are in full force and effect and time remains of the essence.

Amending Agreement No. 1 -
System Lease Agreement
<u>Harrisburg, Pennsylvania</u>

Page 2 of 2

March 9, 1998

Please indicate your agreement to the above amendment by executing the two (2) originals in the space provided, retain one (1) original for your files and return the duplicate original by courier as soon as possible.

Yours truly,

IMAX CORPORATION

By:
Name:
Title:
      John M. Davison
     Executive Vice President
     Chief Financial Officer

By:
Name:
Title:
      G. Mary Ruby
      Vice President
      Legal Affairs

**ACCEPTED AND AGREED TO BY:**

CAPITAL CENTER FOR THE ARTS, SCIENCE AND EDUCATION

By:
Name: Thomas R. Stone
Title: Pres + CEO

By:
Name:
Title:

By:
Name:
Title:



The Whitaker Center for Science and the Arts
301 Market Street
Kunkel Building, Seventh Floor
Harrisburg, PA 17101

Dear Sirs:

Re:     Amending Agreement No. 2 – System Lease Agreement
        **IMAX® 3D Theatre, Harrisburg, Pennsylvania**

This letter will confirm our agreement to amend the Agreement for IMAX® 3D Projection System and Trademark between Capital Center for the Arts, Science and Education, Inc. ("**Client**") and IMAX Corporation ("**IMAX**") dated as of June 18, 1996, as amended by Amending Agreement No. 1 dated March 19, 1998 (collectively, the "**System Lease Agreement**") regarding the lease of an IMAX® 3D Projection System.

We have agreed to amend the System Lease Agreement by deleting the last sentence of the paragraph commencing with the term "**Net Theatre Admissions**" under the heading "**Additional Rent**", on page 3 of Schedule A, and replacing it with the following:

> "If Client offers its patrons combination ticket pricing options for admission to various attractions, including the Theatre, the amount attributable to Net Theatre Admissions will be not less than fifty percent (50%) of the combination ticket representing admissions to the Theatre."

IMAX and Client agree and acknowledge that the terms of this Amending Agreement No. 2 are effective as of August 31, 1999.

Except as specifically amended by this Amending Agreement No. 2, capitalized terms used in this Amending Agreement No. 2 shall have the same meaning ascribed to such terms in the System Lease Agreement. Except as modified by this Amending Agreement No. 2, all terms of the System Lease Agreement remain unaltered and all terms, including those modified hereby, are in full force and effect and time remains of the essence.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Please indicate your agreement to the above amendment by executing two (2) originals in the space provided, retain one (1) original for your files and return the duplicate original by courier as soon as possible.

Yours truly,

**IMAX CORPORATION**

Per: _____

Name: Mary Sullivan

Title: Senior Vice President
Human Resources & Administration

Per: _____

Name: **Ed MacNeil**

Title: VP Finance, Special Projects

**ACCEPTED AND AGREED TO BY:**

CAPITAL CENTER FOR THE ARTS, SCIENCE AND EDUCATION

Per: _____

Name: Byron G. Quann

Title: President & CEO

# EXHIBIT C



December 21, 2001

Whitaker Center for Science and the Arts
The Kunkel Building
301 Market Street, 7th Floor
HARRISBURG, PA.
17101

<u>ATTENTION:  Mr. Michael Patterson, Controller</u>

Dear Sirs:

RE:   **SERVICE PARTNERSHIP PROGRAM AGREEMENT (the "Agreement")**
      **for the IMAX Theatre (the "Theatre")**

**WHEREAS,**

A.   By agreement dated June 18, 1996 between IMAX Corporation ("IMAX") and Capital Center for the Arts, Science and Education, Inc. ("Client") (the "Original Lease Agreement"), Client leased one IMAX 3D GT Projection System,  one Digital Sound System, one Screen and one Glasses Cleaning Machine (collectively, the "System") for installation at the Theatre and contracted for the continued regular service, maintenance and replacement parts for the System, excluding the Screen;

B.   Client has elected to participate in IMAX's Service Partnership Program for the Maintenance Fees as further described herein, subject to the provisions herein;

C.   The parties hereto wish to clarify certain matters and amend certain terms and conditions as set out in the Original Lease Agreement; and

D.   All capitalized terms used but not defined herein have the meanings ascribed thereto in the Original Lease Agreement.

**NOW THEREFORE,** in consideration of the premises, mutual covenants and agreements as set out in the Original Lease Agreement and herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto acknowledge and agree that Part III of Schedule A of the Original Lease Agreement is hereby amended by deleting it in its entirety, except for those provisions relating to renewal and refurbishment, and replacing it with the following:

"PART III

I.   **MAINTENANCE**

     Provided Client is not in default of any of its obligations pursuant to the Original Lease Agreement, including, without limitation, payment of Additional Rent and subject to the terms and conditions of the Agreement, including, without limitation, payment of the Maintenance Fees hereunder, IMAX, its agents or representatives (collectively, "IMAX") will provide (i) good and workmanlike service and preventive maintenance; (ii) all replacement parts for the System (excluding the Screen, Xenon lamps, C.C.U. cartridges, magnetic head assemblies and consumable items); (iii)  on-going service advice; (iv) unlimited telephone support as and when required; (v) on-going support service and system data capture, all in accordance with the IMAX Service Partnership Program ("SPP") as set out herein.

IMAX CORPORATION
2525 Speakman Drive
Mississauga, Ontario
Canada  L5K 1B1
t 905.403.6500  f 905.403.6450
www.imax.com

| Whitaker Center for Science and the Arts Harrisburg, PA. TM #171 | Service Partnership Program Agreement | Page 2 of 4 |
|---|---|---|

2.      **SERVICE PARTNERSHIP PROGRAM**

Client acknowledges and agrees that:

A.      the SPP is a cooperative, progressive program structured in three (3) tiers each of which tier Client will be required to successfully complete in order to achieve the reduced maintenance fees outlined herein. Each of Tier #1, Tier #2 and Tier #3 is described in Schedules A, B and C, respectively and Client will be required to execute each Schedule as and when appropriate;

B.      Tiers #1 and #2 must be successfully completed in the prescribed time frame (set out in Schedules A and B, respectively) and Client must sustain performance levels in accordance with IMAX's reasonable standards at all levels, in order to achieve and maintain Tier #3 pricing as set out in Schedule C hereto; and

C.      Under the SPP, Client shall employ a suitably qualified Chief Projectionist in accordance with Schedule A-1 hereto for the Theatre who shall become an IMAX Certified Technician upon completion of training as set out in Schedule D hereto (the "Certification Training Program"). In the event Client uses and/or shares the services of an IMAX Certified Technician not employed by the Theatre as a full-time employee, Client shall have on staff a suitably experienced Chief Projectionist who shall become an IMAX Certified Chief Projectionist.

3.      **FREQUENCY OF SERVICE AND EMERGENCY VISITS**

IMAX will provide emergency visits and preventive maintenance, cleaning and inspections of the System (excluding the Screen), in accordance with each of Schedules A, B and C attached hereto.   Additional emergency visits will be available to Client at a cost of One Thousand Dollars (U.S. $1,000) per day (applicable to travel days also) plus travel and living expenses associated with such emergency service.  After Client notifies IMAX that it requires emergency service, IMAX will use its best efforts to respond to Client's request, subject to reasonable travel restrictions and other delays beyond its control, within:

(i)       four (4) hours by telephone; and
(ii)      twenty-four (24) hours on-site at the Theatre, if necessary.

Commencing in Tier #2, any IMAX allotted annual emergency visit(s), as set out in each of Schedules B and C, not required by Client during any 12-month period may be reserved for future use when and if required at any time during the Term.

4.      **PARTNERSHIP PROGRAM FEE**

During each year that IMAX provides maintenance and service hereunder, Client shall as consideration for the services provided pay to IMAX, subject to any withholding or similar taxes which may apply, the maintenance fees applicable to each of the tiers of the SPP as follows:

| SERVICE PARTNERSHIP PROGRAM | | | |
|---|---|---|---|
| | Tier #1 | Tier #2 | Tier #3 |
| Maintenance Fee | $73,600 | $59,800 | $46,000 |
| Index Base Date | December 31, 2001 | | |
| Index | U.S. All City Average Consumer Price Index | | |

The maintenance fee applicable to each tier is hereinafter referred to as "the Maintenance Fee".

Client shall pay the Maintenance Fee in equal quarterly installments in arrears.  Alternatively, Client may pay the Maintenance Fee in one installment in advance within fourteen (14) days of each tier's Enrollment/Effective Date, as described in Schedules A, B and C, for a prepayment discount of ten percent (10%) (the "Prepaid Maintenance Fee").  Provided Client is not in default of any material obligations under the Original Lease Agreement or of this Agreement and if IMAX is unable to perform the maintenance services referenced herein, Client may be entitled to reimbursement of a portion of the Prepaid Maintenance Fee pro-rated for the maintenance services not provided to Client during the Term of this Agreement.

| Whitaker Center for Science and the Arts<br>Harrisburg, PA.<br>TM #171 | Service Partnership Program Agreement | Page 3 of 4 |
| --- | --- | --- |

The Maintenance Fee shall, on each anniversary of the Enrollment Date be adjusted to take into account any increase in the Index from the Index Base Date. In the event the Index is not available on such anniversary date, the applicable installment due thereafter will be based on the amount payable for the previous installment and shall be adjusted when the Index is published.

Client may elect to opt out of the SPP at any time upon providing IMAX with sixty (60) days written notice, at which time this Agreement shall be terminated and Client's maintenance obligations under the Original Lease Agreement with respect to maintenance shall resume as if this Agreement had not been entered into by the parties hereto.

In the event that Client does not provide service and preventive maintenance for the System in accordance with the SPP as set out herein and as set out in the Schedules attached hereto to IMAX's satisfaction then:

(A)     If Client is in Tier #3, Client shall immediately revert to Tier #1 and will have to fulfill all of Client's Obligations to progress to Tier #2 and then to Tier #3, as per the terms of this Agreement; and

(B)     If Client is in Tier #2, Client shall immediately revert to Tier #1 and will have to fulfill all of Client's Obligations to progress to Tier #2 and then to Tier #3, as per the terms of this Agreement.

In the event of either (A) or (B) above, IMAX shall reconcile Client's account and shall promptly issue invoices for balances owing by Client, if any.

5.     **IMPROVEMENTS**

IMAX will make at Client's reasonable request and at Client's expense any improvements and modifications developed by IMAX to the Projection System, on as favourable a basis as such improvements are available to similar customers of IMAX.

6.     **MISUSE**

Any damage to the System resulting from the misuse or misoperation of the System, work performed on the System by third parties, carelessness, willful neglect or deliberate damage or negligence by anyone other than IMAX's employees or representatives or technicians having IMAX Certified status in accordance with Schedule D hereto shall be repaired promptly by IMAX at the expense of Client. No such damage to the System shall be repaired by anyone other than IMAX without IMAX's prior written consent.

7.     **INSPECTION**

Client will allow IMAX at all reasonable times access to inspect the System in the Theatre to verify compliance with the SPP."

**CREDITS OWING TO CLIENT**

IMAX acknowledges that Client has prepaid the quarterly installments payable pursuant to the Original Lease Agreement for the periods (i)  09-Jun-01 to 08-Sep-01 and (ii)  09-Sep-01 to 08-Dec-01 in the amount of U.S. $47,273.81. IMAX shall apply a pro-rata credit in the amount of U.S. $30,313.19 against the 1st quarterly installment of $18,400 and the credit balance of $11,913.19 against the 2nd quarterly installment of the Maintenance Fee payable hereunder.

This Agreement does not constitute and shall not be construed as constituting an agency, partnership or joint venture between IMAX and Client.

| Whitaker Center for Science and the Arts<br>Harrisburg, PA.<br>TM #171 | Service Partnership Program Agreement | Page 4 of 4 |
|---|---|---|

Other than as amended by this Agreement all terms and conditions in the Original Lease Agreement shall remain in full force and effect and time shall remain of the essence. IMAX reserves all of its rights, powers and remedies under the Original Lease Agreement, at law and in equity. This Agreement may be executed in any number of counterparts, by facsimile or original, each of which when taken together shall make one and the same instrument.

Yours sincerely,

IMAX CORPORATION

By:
Name: **G. Mary Ruby**
Title: **Senior Vice President**
**Legal Affairs**

By:
Name: **Kathryn A. Gamble**
Title: **VP, Finance & Controller**
*We have authority to bind the company.*

The undersigned hereby agrees with the above noted terms and conditions this 17th day of January , 200 7

CAPITAL CENTER FOR THE ARTS, SCIENCE AND EDUCATION, INC.

By:
Name: Thomas R. Stone
Title:

*I have authority to bind the company.*

Prest C+O

The Whitaker Center for Science and the Arts
Harrisburg, PA.
TM #171

IMAX SERVICE PARTNERSHIP PROGRAM
IMAX 3D GT (Polarized) System

## SCHEDULE "A"

### TIER #1
### ACKNOWLEDGEMENT AND ACCEPTANCE

| TIER #1 TERM: | Not more than twelve (12) months from Enrollment Date set out below |
|---|---|
| MAINTENANCE FEE: | U.S. $73,600 |
| PAYMENT TERMS: | Four (4) quarterly installments in arrears during the Tier #1 Term. |
| PRE-PAYMENT OPTION | |
|    Maintenance Fee: | $66,240 |
|    Payment Terms: | One (1) installment in advance within fourteen (14) days of the Enrollment Date |
|    Elect Pre-Payment Option: | YES _____  NO _____ |
| | *For invoicing purposes, kindly initial in the appropriate space provided above.* |
| INDEX BASE DATE: | December 31, 2001 |
| INDEX: | U.S. All City Average Consumer Price Index |
| IMAX MAINTENANCE SERVICES: | IMAX will render all services as required to perform its maintenance obligations as set out in Section 1 of this Agreement including but not limited to:<br><br>♦  Not less than four (4) quarterly preventive maintenance, cleaning and inspections for the System, excluding the Screen;<br><br>♦  Emergency visits as required;<br><br>♦  (i) order and supply all replacement parts for the System (excluding consumables and the Screen); (ii) provide a 24-hour response telephone help-line and (iii) maintain service history database(s). |
| CLIENT'S OBLIGATIONS: | CLIENT will:<br><br>♦  Hire or have on staff technical personnel having a relevant technical background with qualifications and experience established by IMAX attached hereto as Schedule A-1.<br><br>♦  Undergo IMAX comprehensive training of a minimum of one (1) technical personnel ("Certified Technician") to perform service and preventive maintenance on the System.<br><br>♦  The training will be provided at IMAX's facility in Mississauga, Ontario and all training fees and costs associated with travel and living of Client's technical personnel will be to the account of Client.<br><br>♦  Sustain SPP requirements and remain in good financial and legal standing to IMAX's satisfaction. |

AGREED to this 15th day of August, 2001 ("ENROLLMENT DATE")

**CAPITAL CENTER FOR THE ARTS, SCIENCE AND EDUCATION, INC.**

By _____
(Authorized Signature(s))

Thomas R. Starr
Name(s) (Type or Print)

Pres + CEO
Title(s) (Type or Print)

ACCEPTED this 3rd day of January, 2002

**IMAX CORPORATION**

By (Authorized Signature(s))

G. Mary Ruby
Senior Vice President
Legal Affairs
Names(s) (Type or Print)

Kathryn A. Gamble
VP, Finance & Control
Title(s) (Type or Print)

The Whitaker Center for Science and the Arts
Harrisburg, PA.
TM #171

IMAX SERVICE PARTNERSHIP PROGRAM
IMAX 3D GT (Polarized) System

## SCHEDULE "A-1"

## RECOMMENDED QUALIFICATIONS/EXPERIENCE FOR CERTIFIED TECHNICAL PERSONNEL

The following qualifications are being provided to assist you in hiring technical personnel able to achieve the on-going responsibilities required of the Chief Projectionist and Technician.

---

### CHIEF PROJECTIONIST

- Mechanical and/or electrical aptitude
- General computer proficiency

### OTHER ASSETS
- Technical trade school diploma or equivalent
- Experience operating large-format projection equipment

---

### TECHNICIAN

**ELECTRICAL**
- Read drawings
- Use basic test equipment (OSC, DVM)
- Understand basic AC/DC circuits
- Familiar with basic audio fundamentals

**MECHANICAL**
- Basic plumbing
- Read mechanical drawings
- Understands basic pneumatics
- Knowledge of basic tool usage

**GENERAL**
- General computer proficiency
- Minimum of 900 hours of operating large-format projection equipment

**OTHER ASSETS**
- Technical trade school diploma or equivalent

The Whitaker Center for Science and the Arts                    IMAX SERVICE PARTNERSHIP PROGRAM
Harrisburg, PA.                                                 IMAX 3D GT (Polarized) System
TM #171

## SCHEDULE "B"

## TIER #2
## ACKNOWLEDGEMENT AND ACCEPTANCE

| | |
|---|---|
| EFFECTIVE DATE: | Upon completion of IMAX comprehensive training |
| TIER #2 TERM: | Not more than twelve (12) months from Effective Date |
| MAINTENANCE FEE: | U.S. $59,800 |
| PAYMENT TERMS: | Four (4) quarterly installments in arrears during the Tier #2 Term |
| PRE-PAYMENT OPTION<br>   Maintenance Fee:<br>   Payment Terms:<br>   Elect Pre-Payment Option: | <br>$53,820<br>One (1) installment in advance within fourteen (14) days of the Effective Date<br>        YES _____          NO _____<br>*For invoicing purposes, kindly initial in the appropriate space provided above.* |
| INDEX BASE DATE: | December 31, 2001 |
| INDEX: | U.S. All City Average |
| IMAX MAINTENANCE SERVICES: | IMAX will render all services as required to perform its maintenance obligations set out in Section 1 of this Agreement including but not limited to:<br><br>♦   be in attendance for not less than two (2) of the four (4) regularly scheduled preventive maintenance, cleaning and inspections for the System, excluding the Screen;<br><br>♦   two (2) annual emergency visits;<br><br>♦   (i) order and supply all replacement parts for the System (excluding consumables and the Screen); (ii) provide a 24-hour response telephone help-line and (iii) maintain service history database(s). |
| CLIENT'S OBLIGATIONS: | CLIENT will:<br><br>♦   Conduct not less than four (4) quarterly preventive maintenance, cleaning and inspections of the System, excluding the Screen.<br><br>♦   Complete and provide to IMAX requisite technical documentation and service reporting.<br><br>♦   Sustain SPP requirements and remain in good financial and legal standing to IMAX's satisfaction. |

| | |
|---|---|
| AGREED to this _____ day of _____,<br>200__ ("EFFECTIVE DATE")<br>**CAPITAL CENTER FOR THE ARTS,**<br>**SCIENCE AND EDUCATION, INC.**<br><br>_____  _____<br>By(Authorized<br>signature(s))<br>Thoma. R. Gore<br>_____  _____<br>Name(s) (Type or Print)<br>Pre + Pto<br>_____  _____<br>Title(s) (Type or Print) | ACCEPTED this _____ day of _____, 200__<br><br>**IMAX CORPORATION**<br><br><br>_____  _____<br>By (Authorized Signature(s))<br><br>_____  _____<br>Names(s) (Type or Print)<br><br>_____  _____<br>Title(s) (Type or Print) |

The Whitaker Center for Science and the Arts
Harrisburg, PA.
TM #171

IMAX SERVICE PARTNERSHIP PROGRAM
IMAX 3D GT (Polarized) System

### SCHEDULE "C"

### TIER #3
### ACKNOWLEDGEMENT AND ACCEPTANCE

| EFFECTIVE DATE: | April 23, 2003 |
|---|---|
| TIER #3 TERM: | For remainder of Lease Agreement Term, provided terms of SPP are adhered to |
| MAINTENANCE FEE: | U.S. $46,000 |
| PAYMENT TERMS: | Four (4) quarterly installments in arrears during the Tier #3 Term |
| PRE-PAYMENT OPTION | |
| Maintenance Fee: | $41,400 |
| Payment Terms: | One (1) installment in advance within fourteen (14) days of the Effective Date |
| Elect Pre-Payment Option: | YES _____ NO _____ <br> *For invoicing purposes, kindly initial in the appropriate space provided above.* |
| INDEX BASE DATE: | December 31, 2001 |
| INDEX: | U.S. All City Average Consumer Price Index |
| IMAX MAINTENANCE SERVICES: | During each year of the Tier #3 Term, IMAX will render all services as required to perform its maintenance obligations set out in Section 1 of this Agreement including but not limited to: <br><br> ♦ be in attendance for not less than one (1) of the four (4) regularly scheduled preventive maintenance, cleaning and inspections for the System, excluding the Screen; <br><br> ♦ one (1) annual emergency visit; <br><br> ♦ (i) order and supply all replacement parts for the System (excluding consumables and the Screen); (ii) provide a 24-hour response telephone help-line and (iii) maintain service history database(s). |
| CLIENT'S OBLIGATIONS: | During each year of the Tier #3 Term, CLIENT will: <br><br> ♦ Conduct not less than four (4) quarterly preventive maintenance, cleaning and inspections of the System, excluding the Screen. <br><br> ♦ Complete and provide to IMAX requisite technical documentation and service reporting. <br><br> ♦ Sustain SPP requirements and remain in good financial and legal standing to IMAX's satisfaction. |

AGREED to this 23 day of April, 2003
("EFFECTIVE DATE")
CAPITAL CENTER FOR THE ARTS, SCIENCE AND EDUCATION, INC.

By (Authorized Signature(s))

Michael Patterson
Name(s) (Type or Print)

_____
Title(s) (Type or Print)

ACCEPTED this _____ day of _____, 200__
IMAX CORPORATION

By (Authorized Signature(s))

Kathryn A. Gamble
VP, Finance & Controller

Names(s) (Type or Print)

_____
Title(s) (Type or Print)

The Whitaker Center for Science and the Arts
Harrisburg, PA.
TM #171

IMAX SERVICE PARTNERSHIP PROGRAM
IMAX 3D GT (Polarized) System

## SCHEDULE "D"

## CERTIFICATION TRAINING PROGRAM

## GENERAL TERMS AND CONDITIONS

1.  Client will have on staff one (1) Certified Technician who has successfully completed the comprehensive IMAX certification training. The Certified Technician will be certified to perform maintenance services on the IMAX System.

2.  If IMAX, acting reasonably, determines that an individual is no longer qualified, or has failed to adequately operate or maintain the System used by Client, IMAX may require such person to be re-certified or replaced. To maintain the standards associated with IMAX theatres around the world, IMAX may require that the service revert to the standard Full Service Program in the unlikely event that objective quality standards are not achieved, even after re-training or replacement of technical personnel.

3.  If Client replaces any certified technical personnel and wishes to continue the Program, additional qualified personnel will attend at IMAX's facility within three (3) months to apply and/or undergo certification training to operate and maintain the System. All costs will be paid by Client. If the certification training has not taken place within three (3) months of the replacement of technical personnel, Client loses the discounts applicable to Tiers #2 and #3 and IMAX will provide full service at its Tier #1 rates until a certified replacement is in place.

4.  All manuals and documentation provided to Client, at IMAX's cost, for operation and maintenance of the IMAX System will be exclusively for the use of technical personnel. Upon express written permission, IMAX may permit such materials to be copied or removed from the projection booths at its theatres.

5.  The Certified Personnel will attend and assist at all visits by IMAX personnel for regular or emergency service visits, if available.

6.  Client will (i) complete and provide to IMAX requisite technical documentation and service reporting; (ii) provide remote (telephone/modem) access and on-site System access for IMAX use; (iii) undergo IMAX Technical Services System performance audits, not less than once per year and (iv) sustain good financial and legal standing to IMAX's satisfaction.

7.  IMAX will update the training provided on a regular basis and will test the competency of all of Client's certified technical personnel no earlier than once every two (2) years in the case of the Certified Technician, or as may be directed by IMAX from time to time. The training will be provided at IMAX's facility in Mississauga, Ontario and Client will be responsible for the re-training fee and all travel and related expenses.

8.  Client will sustain in-theatre and projection booth performance levels in accordance with IMAX prescribed standards, including Technical Specifications set out in the Original Lease Agreement, failing which, Client may lose its certified status and corresponding maintenance fee discount.

## RENEWAL AND AMENDING AGREEMENT

THIS AGREEMENT dated as of the _____ day of March, 2004

B E T W E E N:

        **CAPITAL CENTER FOR THE ARTS, SCIENCE AND EDUCATION, INC.**, a company incorporated under the laws of the State of Pennsylvania, (hereinafter the "CLIENT")

        – and –

        **IMAX CORPORATION**, a company incorporated under the laws of Canada, (hereinafter "IMAX")

**WHEREAS** the CLIENT and IMAX entered into a System Lease Agreement dated the 18th day of June, 1996, as amended, (the "System Lease Agreement"), whereby IMAX leased to the CLIENT an IMAX® 3D Projection System for installation in the Whitaker Center for Science and the Arts, Harrisburg, Pennsylvania, U.S.A.;

**AND WHEREAS** IMAX and the CLIENT have agreed to amend the Initial Term of the System Lease Agreement;

**AND WHEREAS** IMAX and the CLIENT have further agreed to modified the Additional Rent payable pursuant to the System Lease Agreement.

IN CONSIDERATION of the premises and the mutual agreements contained in the System Lease Agreement and this Renewal and Amending Agreement ("Agreement") the parties agree as follows:

All capitalized terms used but not defined herein shall have the meanings ascribed thereto in the System Lease Agreement.

**A.    EFFECTIVE DATE**

The effective date of this Agreement is March 1, 2004.

**B.    TERM OF AGREEMENT**

Schedule A, Part I, Term of Agreement, of the System Lease Agreement is hereby deleted in its entirety and replaced with the following:

*"The initial term of this Agreement shall commence on the date hereof and end on the 20th anniversary of the Date of Acceptance, as defined in Paragraph 3 (d) of Schedule B – General Terms and Conditions (the "Initial Term")."*

**C.    ADDITIONAL RENT**

All references to "Minimum Rent/Seat/Annum" in Schedule A, Part II, Additional Rent of the System Lease Agreement are hereby replaced with "Minimum Rent"

The following section in Schedule A, Part II, Additional Rent of the System Lease Agreement is hereby deleted in its entirety:

| *"EST. NO. OF SEATS* | *MINIMUM RENT/SEAT/ANNUM* | *MINIMUM RENT* | *INDEX BASE DATE* |
|---|---|---|---|
| *200* | *U.S. $355* | *U.S. $71,000* | *December 31, 1995"* |

and replaced by:

C:\Documents and Settings\robert\Local Settings\Temporary Internet Files\OLK7\Harrisburg Renewal and Amending Agreement_v2.doc

"*MINIMUM RENT*

*U.S. $75,000*"

The last two paragraphs of Schedule A, Part II, Additional Rent of the System Lease Agreement are hereby deleted in their entirety.

**D.      Digital Technology**

If, during the Initial Term, IMAX develops new digital projection technology ("DP Technology") for use in the Theatre and the CLIENT is desirous of leasing DP Technology, IMAX shall provide pricing equal to that which IMAX has provided to similar sized clients leasing similar technology during the applicable calendar year.

**E.      QTRU Upgrade**

Should the CLIENT decide to purchase from IMAX one (1) 150-minute Quick Turn Reel Unit ("QTRU") upgrade, including two (2) extended length arms, two (2) 72" platters, and upgrades to the QTRU control system (collectively the "Upgrade") for the existing QTRU installed in the Theatre, IMAX agrees to sell the Upgrade for a price of U.S. $14,000 (the "Price"), F.O.B. IMAX's docks, Mississauga, Ontario, Canada.  The Price will be payable in 10 equal monthly installments of U.S. $1,400 (the "Payments"), the first of the Payments becoming due the 1st day of the month immediately following the installation of the Upgrade.  The actual installation date to be mutually agreed upon by the parties, but in any event, the installation of the Upgrade shall occur not later than December 31, 2004.

**F.      Confidentiality**

The parties shall keep in strict confidence all information relating to this Agreement. Neither party shall use or disclose any confidential or proprietary information without the prior written consent of the other party.

**G.      Entire Agreement**

This Agreement, together with the System Lease Agreement, constitutes the entire agreement between IMAX and the CLIENT with respect to the subject matter contained herein and may not be modified or amended except in writing.   Except as modified herein the System Lease Agreement remains unamended and in full force and effect and time remains of the essence.

**H.      Headings**

The headings contained in this Agreement are for reference only and shall not affect the meaning or construction of this Agreement.

**I.      Enurement**

This Agreement shall enure to the benefit of and be binding upon the parties and their respective successors and permitted assigns.

**J.      Counterparts**

This Agreement may be executed in any number of counterparts each of which when executed and delivered is an original but all of which taken together constitute one and the same instrument.

DATED as of the       day of March, 2004.

| IMAX CORPORATION | CAPITAL CENTER FOR THE ARTS, SCIENCE AND EDUCATION, INC. |
|---|---|
| (Signature) | (Signature) |
| G. Mary Ruby | President & CEO |
| (Title) Senior Vice President Legal Affairs | (Title) |
| (Signature) | I have the authority to bind the company. |
| Mary Sullivan | |
| (Title) Senior Vice President Human Resources & Administration | |

# EXHIBIT D



Telephone: (905) 403-6577
Fax: (905) 403-6450
Email: jskinner@imax.com

September 4, 2014

**VIA COURIER**

Select Medical Whitaker Center for
Science and the Arts
301 Market Street
Kunkel Building, Seventh Floor
Harrisburg, Pennsylvania
17101

**Attention: President**

Dear Sirs:

Re:     **Notice of Default**

I refer to that certain Agreement for IMAX® 3D Projection System and Trademark dated June 18, 1996, as amended by Amending Agreements No.1 and 2 dated March 19, 1998 and August 31, 1999 respectively, and Renewal and Amending Agreement dated March 1, 2004 (collectively, the "**Lease Agreement**") between IMAX Corporation ("**IMAX**") and Capital Center for the Arts, Science and Education, Inc. ("**Capital Center**") related to the operation of an IMAX® theatre located at the Select Medical Whitaker Center for Science and the Arts in Harrisburg, Pennsylvania.

Any capitalized term used but not defined in this letter shall have the meaning attributed to it in the Lease Agreement.

This letter shall serve as Notice of Default pursuant to the Lease Agreement. Capital Center has defaulted on its obligations to IMAX with respect to payment of amounts owing pursuant to the Lease Agreement.

We note that as of the date of this letter Capital Center is in arrears in the total amount of US$136,647 with respect to Minimum Rent and annual maintenance fee obligations due and payable pursuant to the Lease Agreement.

IMAX requires that Capital Center fully cure such default as set forth in the Lease Agreement, which requires payment default to be cured within thirty (30) days of the date of this Notice of Default. Any failure by Capital Center to fully remedy and cure its default will permit IMAX to take steps to enforce its rights under the Lease Agreement, which includes terminating the Lease Agreement and claiming all amounts owing including all unpaid Minimum Rent obligations for the Initial Term of the Lease Agreement. We note that the Initial Term of the Lease Agreement extends to 2019, and the net present value of future Minimum Rent obligations of Capital Center as of September 1, 2014 totals US$343,148. Upon a termination the full amount owing by Capital Center would be US$479,794.94 as of September 1, 2014.

- 2 -

IMAX reserves all of its legal rights and remedies available under the Lease Agreement, and nothing contained herein or in any other letter or correspondence shall be deemed an admission or waiver of any rights of any kind.

Yours very truly,

IMAX **CORPORATION**

James A. Skinner
Senior Vice President and Associate General Counsel

c:      David Berman (*IMAX Corporation*)

# EXHIBIT E



Telephone: (905) 403-6577
Fax: (905) 403-6450
Email: jskinner@imax.com

October 30, 2014

VIA COURIER

Select Medical Whitaker Center for
Science and the Arts
301 Market Street
Kunkel Building, Seventh Floor
Harrisburg, Pennsylvania
17101

**Attention: President**

Dear Sirs:

Re:   **Notice of Termination**

I refer to that certain Agreement for IMAX® 3D Projection System and Trademark dated June 18, 1996, as amended by Amending Agreements No. 1 and 2 dated March 19, 1998 and August 31, 1999 respectively, and Renewal and Amending Agreement dated March 1, 2004 (collectively, the "**Lease Agreement**") between IMAX Corporation ("**IMAX**") and Capital Center for the Arts, Science and Education, Inc. ("**Capital Center**") related to the operation of an IMAX® theatre located at the Select Medical Whitaker Center for Science and the Arts in Harrisburg, Pennsylvania.

IMAX provided Capital Center formal written notice on September 4, 2014 of various events of default pursuant to the Lease Agreement ("**Notice of Default**"), as a result of Capital Center failing to remit payments of various amounts payable pursuant to the Lease Agreement. As Capital Center continues to be in default of its material obligations under the Lease Agreement by not paying IMAX the total arrears as demanded in the Notice of Default, and has taken no steps to cure such defaults, IMAX hereby terminates the Lease Agreement.

Capital Center shall immediately act in accordance with the following:

1. Cease to use all IMAX® and IMAX® 3D trademarks (collectively the "**Trademarks**") and remove all references to the Trademarks, as applicable, from the theatre signage, theatre name, promotional material, advertising materials, internet websites, and any other materials using the Trademarks.

2. Pay to IMAX all amounts due and owing pursuant to the terms of the Lease Agreement. As of October 30, 2014 the total amount owed under the Lease Agreement is US$376,203.45.

3. Ensure the survival of certain terms of the Lease Agreement in accordance with the terms therein.

IMAX will take whatever legal steps are necessary to enforce its rights as set forth in this letter, including initiating legal proceedings against Capital Center to claim all amounts owed by Capital Center

- 2 -

and to ensure that Capital Center makes no improper use of the Trademarks following the date of this letter.

             *     *     *     *     *     *     *     *     *     *

IMAX reserves any all of its rights at law in equity or pursuant to the Lease Agreement and any other agreement between IMAX and Capital Center.  Nothing contained herein or in any other letter or correspondence shall be deemed to be an admission or waiver of any rights of any kind.

Yours very truly,

**IMAX CORPORATION**

James A. Skinner
Senior Vice President and Associate General Counsel

Cc: David Berman